**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STEPHEN ROBERT DECK,
　　　　　　*Petitioner-Appellant*,

　　　　　v.

MACK JENKINS, Chief Probation
Officer,
　　　　　　*Respondent-Appellee*.

No. 13-55130

D.C. No.
8:11-cv-01767-
MWF-FFM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted
April 8, 2014—Pasadena, California

Filed September 29, 2014
Amended February 9, 2016

Before: Sidney R. Thomas, Milan D. Smith, Jr.,
and Morgan Christen, Circuit Judges.

Order;
Dissent to Order by Judge Bea;
Opinion by Judge Christen;
Dissent by Judge Milan D. Smith, Jr.

# SUMMARY[*]

## Habeas Corpus

The panel filed amended majority and dissenting opinions, denied a petition for panel rehearing, and denied on behalf of the court a petition for rehearing en banc, in a case in which the panel reversed the district court's dismissal of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction for an attempted lewd act upon a child under the age of 14.

The California Court of Appeal (CCA) established that a trial error occurred when the prosecutor, in closing argument, negated an essential element of intent under California law by "pushing defendant's intent to commit a lewd act on 'Amy' to, potentially, 'next week' or in 'two weekends' or 'just some point in the future.'" The panel concluded that although the CCA did not independently evaluate the federal constitutional question, its harmlessness determination amounted to an implied ruling that the prosecutor's error did not amount to a federal constitutional violation.

The panel held that the CCA's conclusion that no constitutional violation occurred was unreasonable because the prosecutor's misstatements were not inadvertent or isolated; because the jury was never correctly instructed that, in order to convict, it had to find the petitioner had moved beyond preparation and would engage in a lewd act with Amy the night he was arrested; and because the evidence

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

concerning the temporal aspect of the petitioner's intent was not overwhelming. The panel concluded that no fairminded jurist could agree with the CCA's harmlessness determination, and that the prosecutor's misstatements resulted in actual prejudice.

The panel remanded with instructions to grant the petition unless the State agrees to grant the petitioner a new trial within a reasonable period of time.

Dissenting, Judge M. Smith wrote that the majority flouts clear AEDPA precedent, committing the same error the Supreme Court has criticized this court for making by collapsing the distinction between an unreasonable application of federal law and what the majority believes to be an incorrect or erroneous application of federal law.

Judge Bea, joined by Judges O'Scannlain, Tallman, Bybee, Callahan, M. Smith, Ikuta, and N.R. Smith, dissented from the denial of rehearing en banc. He wrote that the majority disregarded the deference that AEDPA requires, rejecting a California appellate court's reasoned and supported conclusion that prosecutorial misstatements made during the petitioner's trial constituted harmless errors, in favor of its own determination that such statements were actually prejudicial.

**COUNSEL**

Charles M. Sevilla (argued), Law Office of Charles Sevilla, San Diego, California, for Petitioner-Appellant.

Kamala D. Harris, Julie L. Garland, Kevin Vienna (argued), and David Delgado-Rucci, Office of the Attorney General of California, San Diego, California, for Respondent-Appellee.

**ORDER**

The opinion filed on September 29, 2014, is amended and the amended majority and dissenting opinions are filed concurrently with this order. With these amendments, a majority of the panel has voted to deny the petition for panel rehearing. The full court has been advised of the petition for rehearing and rehearing en banc. A judge of the court requested a vote on whether to rehear the matter en banc. A majority of the nonrecused active judges did not vote in favor of rehearing en banc. Fed. R. App. P. 35(f). The petition for panel rehearing and the petition for rehearing en banc are **DENIED**. A dissent from denial of rehearing en banc is filed concurrrently with this order. No further petitions for rehearing or rehearing en banc may be filed.

BEA, Circuit Judge, with whom O'SCANNLAIN, TALLMAN, BYBEE, CALLAHAN, M. SMITH, IKUTA, and N.R. SMITH, Circuit Judges, join, dissenting from the denial of rehearing en banc:

The ink is hardly dry on the Supreme Court's latest reversal of another of our judgments where we disregarded the deference the Antiterrorism and Effective Death Penalty Act ("AEDPA")[1] requires we give state court decisions that any trial court errors were harmless, thus precluding any entitlement to habeas relief.[2] Yet here we have gone and done it again. The panel majority (the "Majority") today rejects a California appellate court's reasoned and supported conclusion that prosecutorial misstatements made during Defendant Deck's trial constituted harmless errors, in favor of its own determination that such statements were actually prejudicial. As explained below, I find four major missteps in the Majority's opinion.

---

[1] Under AEDPA, a federal court may grant habeas relief based on trial error that a state court has previously determined to be harmless only if the state court's determination involved an "unreasonable" application of "clearly established . . . law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court recently emphasized in *Davis v. Ayala* that "a state-court decision is not unreasonable if fairminded jurists could disagree on [its] correctness." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (internal quotation marks omitted) (alteration in original).

[2] *See Ayala v. Wong*, 756 F.3d 656 (9th Cir. 2013), *rev'd and remanded sub nom. Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015). *Ayala* held that a petitioner cannot show "actual prejudice" under *Brecht*, nor a right to federal habeas relief, unless he *first* demonstrates that the *Chapman*/AEDPA standard is met, *i.e.*, that no "fairminded jurist could agree" with the state court's application of well-established Supreme Court precedent.

First, the Majority reads *Davis v. Ayala* to hold that a federal habeas court's finding that a state trial court error was prejudicial under *Brecht*[3] dispenses with AEDPA's requirement that the federal habeas court must *also* find that the state court applied "well-established" Supreme Court precedent in an "unreasonable" manner when it found the same error harmless (a "*Chapman*/AEDPA" analysis).[4] *See* Slip Op. at 63–64. This conclusion is illogical because *Brecht* requires only a finding by a federal court that (in its view) an error was not harmless—without any deference to, or evaluation of, the reasonableness of a prior state court determination. Under *Chapman*/AEDPA, conversely, we must accept a state court's prior harmless error determination unless it involved such an "unreasonable" application of Supreme Court precedent that "no fairminded jurist" could agree with it. *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). Thus, though a *Chapman*/AEDPA finding would

---

[3] In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court held that a prisoner is not entitled to habeas relief unless he can show that he was "actual[ly] prejudice[d]," by a trial court error of constitutional magnitude, meaning that the trial court error had a "substantial and injurious effect or influence . . . [on] the jury's verdict" (the "*Brecht* standard"). *Id.* at 627, 637. The Court found that principles of "finality," "comity," and "federalism" justified such a deferential standard of review in federal habeas (*i.e.* collateral) proceedings. *Id.* at 635.

[4] On *direct* appeal, a state court applies the "*Chapman* test," under which a petitioner is entitled relief unless the court finds that any federal constitutional error at trial was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). On *collateral* review by a federal habeas court, however, the *Chapman* test is combined with AEDPA deference, resulting in the "*Chapman*/AEDPA" test, under which a federal habeas court cannot disturb a state court's finding of harmlessness unless the state court "rendered a decision with which no fairminded jurist could agree." *Ayala*, 135 S. Ct. at 2208.

necessarily mean that a trial error was harmful (and thus also satisfy *Brecht*) the contrary is not necessarily true. Indeed, the panel Majority's test got it precisely backwards.

The Majority did so by committing its second error: It read Justice Alito's statement that "the *Brecht* test subsumes the limitations imposed by AEDPA," *id.* at 2199, to mean that *Brecht eliminated*, rather than *incorporated*, AEDPA deference. But it is hard to see how that can be correct when the *Brecht* standard was developed in 1993—three years *before* AEDPA was enacted. And of course, were the Majority's understanding the correct reading of the phrase, *Ayala* would necessarily have come out the other way.[5] As a result of its misreading, the panel Majority's decision is directly contradictory to the Court's opinion in *Ayala*. In fact, it is consistent with Justice Sotomayor's *dissent* in *Ayala*.

Third, applying its faulty test, the panel Majority's *analysis* fails to afford proper AEDPA deference to the state court's harmless error determination. In the portions of the Majority's opinion dedicated to finding the state court's determination of harmless error unreasonable, the Majority considers only the evidence and arguments pointing to a *prejudicial* effect of the prosecutor's misconduct, rather than (as AEDPA requires) whether any of the evidence and arguments put forth by the state court provided a reasonable basis for that court's determination that any error was harmless.

---

[5] *Ayala* specifically *reversed* our grant of habeas relief to Ayala based only on our finding of "actual prejudice" under *Brecht*, explaining that we had erred in failing to recognize that *Chapman*/AEDPA sets forth a "precondition" to habeas relief. *Ayala*, 135 S. Ct. at 2196, 2198.

Fourth, the legal basis for the Majority's conclusion that "no fairminded jurist" could agree with the state court's finding of harmless error under *Darden v. Wainwright*, 477 U.S. 168 (1986), in fact supports the *opposite* conclusion. That is, *every* Supreme Court precedent regarding prosecutorial misconduct cited by the Majority found not prejudicial error, but *harmless* error.

As highlighted in Judge M. Smith's dissent in *Deck v. Jenkins*, 768 F.3d 1015, 1031 & n.1 (9th Cir. 2014), the Majority's approach to federal habeas review has been rejected by the Supreme Court not once, not twice, but upwards of a dozen times. *See, e.g.*, *Ayala*, *supra*, 135 S. Ct. at 2196–99, 2208; *see also Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009) (en banc), *rev'd and remanded by Harrington v. Richter*, 562 U.S. 86, 101–02 (2011) (rejecting our conclusion that because *we* found a prejudicial *Strickland* violation under *Brecht*, the "state court's decision to the contrary constituted an unreasonable application of *Strickland*," and explaining that "AEDPA demands more" than the traditional *Brecht* test); *Smith v. Mitchell*, 624 F.3d 1235 (9th Cir. 2010), *rev'd and remanded sub nom. Cavazos v. Smith*, 132 S. Ct. 2, 6–8 (2011) (per curiam) (reversing our grant of habeas relief and stating: "This Court vacated and remanded this judgment twice before, calling the panel's attention to this Court's opinions highlighting the necessity of *deference to state courts in § 2254(d) habeas cases*. Each time the panel persisted in its course, reinstating its judgment without seriously confronting the significance of the cases called to its attention . . . . Its refusal to do so necessitates this Court's action today." (emphasis added)).

In sum, the *Deck* Majority's application of *Brecht* without §2254(d)(1) deference flouts the Supreme Court's recent

mintage in *Davis v. Ayala* by immediately reinstating the framework the Court had just rejected. Moreover, because the *Ayala* Court reversed and remanded that case back to the Ninth Circuit for proceedings consistent with its opinion, *see Ayala*, 135 S. Ct. at 2208, the *Deck* Majority's issuance of a directly contradictory opinion will immediately create not only an intra-Circuit split, but also divergence between our own precedent and that of our sister Circuits. *See* Fed. R. App. P. 35(a)(1).**[6]** This is why I called this case *en banc*. Unfortunately, the call failed.

## I.

In *Davis v. Ayala*, the Supreme Court squarely addressed the proper interaction between *Brecht's* "actual prejudice" standard, *see* n.3, *supra*, and AEDPA's mandated deference (which post-dates *Brecht*),**[7]** where the state court has previously decided a federal constitutional issue on its merits. *Ayala*, 135 S. Ct. at 2187–98 (2015). In *Ayala*, the petitioner sought federal habeas relief after the California Supreme Court affirmed his murder conviction and death sentence. *See id.* at 2194–95. During jury selection, Ayala (who is Hispanic) had objected to seven of the prosecutor's eighteen preemptory challenges, which seven challenges had eliminated all potential black and Hispanic jurors on the panel. Ayala's objection was that the challenges were

---

**[6]** Re-hearing *en banc* is justified when "the panel decision conflicts with a decision of the United States Supreme Court," Fed. R. App. P. 35(b)(1)(A), and resolution of the conflict through "*en banc* consideration is necessary to secure or maintain uniformity of the court's decisions," *id.* 35(a)(1).

**[7]** AEDPA was enacted in 1996, *see* 28 U.S.C. § 2254(d)(1), three years after the Supreme Court's 1993 decision in *Brecht*. *See supra*, n.3.

impermissibly race-based under *Batson v. Kentucky*, 476 U.S. 79 (1986). *See Ayala*, 135 S. Ct. at 2193–94. The trial judge had permitted the prosecutor to offer race-neutral reasons for each strike, but only in an *ex parte* hearing, because the prosecutor had claimed he did not want to reveal his trial strategy. *Id.* at 2193. On direct appeal, the California Supreme Court held that the exclusion of Ayala's counsel from the hearing on preemptory strikes was federal constitutional error,[8] but that such error was "harmless beyond a reasonable doubt" under the *Chapman* test because nothing defense counsel could have said, had he been present when the trial judge required the prosecution to state reasons for his preemptory challenges, would have changed the trial court's rulings. *Id.* at 2195.

The Ninth Circuit reversed, granting habeas relief. *Id.* at 2193. It identified *Brecht* as the governing standard on collateral review, but added: "We apply the *Brecht* test *without regard for the state court's harmlessness determination*." *Id.* at 2196 (emphasis added). The court then concluded that the exclusion of defense counsel from *ex parte* communications by the prosecutor to the trial court judge was *not* harmless, but constituted prejudicial error under *Brecht*. *Id.* at 2197.

---

[8] The California Supreme Court suggested that the exclusion of defense counsel from hearings regarding a prosecutor's use of preemptory strikes "may amount to a denial of due process." *People v. Ayala*, 6 P.3d 193, 204 (Cal. 2000) (explaining, that "[t]he right of a criminal defendant to an adversary proceeding is fundamental to our system of justice. . . . This includes the right to be personally present and to be represented by counsel at critical stages during the course of the prosecution").

The Supreme Court reversed us yet again,[9] specifically rejecting our exclusive application of *Brecht*, without AEDPA deference to the state court's harmless error determination. *See id*. at 2198. The Court explained that a prior state court harmless error adjudication triggered AEDPA deference within the traditional *Brecht* analysis. *See id.* at 2199 ("[A] prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA."). If AEDPA deference has been triggered by a state court merits determination as to the claimed federal constitutional violation, *Chapman*/AEDPA—that is, a finding that the state court's harmlessness determination was an "unreasonable" application of "clearly established" Supreme Court precedent—becomes an additional "precondition to the grant of habeas relief." *Id.* at 2198–99 (A petitioner "must show that the state court's decision to reject his claim 'was so lacking in justification that there was an error well understood . . . in existing law beyond any possibility for fairminded disagreement.'" (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011))). In fact, *Chapman*/AEDPA requires the federal court to consider not only the arguments that the state court *actually* made, but also those arguments that "could have supported[] the state court's decision." *Harrington*, 562 U.S. at 102.

Consistent with this framework, the Supreme Court's analysis in *Ayala* "beg[a]n with the prosecution's explanation[s]" for striking each juror and concluded with

---

[9] For a relation of our circuit's history of reversals in AEDPA cases, see Judge M. Smith's dissent, *Deck v. Jenkins*, 768 F.3d 1015, 1031 & n.1 (9th Cir. 2014).

findings that the petitioner could show neither "actual prejudice" (*Brecht*) nor that "no fairminded jurist could agree with the state court's application of *Chapman*." *See, e.g.*, *Ayala*, 135 S. Ct. at 2203; *see also* 28 U.S.C. § 2254(d)(1). The Court again chastised our court for failing to consider—without "substitut[ing] its own opinions"— whether "any fairminded jurist" could agree with the state court's proffered reasons for finding any error was harmless. *See, e.g.*, *Ayala*, 135 S. Ct. at 2202 ("The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems . . . not to apply *de novo* review of factual findings and to substitute its own opinion for the [state court's] determination . . . ." (internal quotation marks and citations omitted)); *see also id.* at 2205 (rejecting the Ninth Circuit's "speculation" and "flight of fancy" about "extrarecord information defense counsel might have mentioned").

In her *Ayala* dissent, Justice Sotomayor argued that "[i]f a trial error is prejudicial under *Brecht's* standard, a state court's determination that the error was harmless beyond a reasonable doubt is necessarily unreasonable." *Ayala*, 135 S. Ct. at 2211 (2015) (Sotomayor, J., dissenting). *But that proposition is exactly what the Davis v. Ayala majority had just rejected*. *See id.* at 2197, 2208 (holding that the Ninth Circuit's finding of actual prejudice under *Brecht* did *not* "necessarily" render the state court's contrary finding "unreasonable"; a separate *Chapman*/AEDPA analysis was required to make that determination). As discussed below, however, the *Deck* panel Majority adopted Justice Sotomayor's erroneous statement of law. In my view, this outright disregard for binding Supreme Court precedent, particularly in light of the Supreme Court's recent reversal of

the Ninth Circuit on this very question, warranted *en banc* review. *See* Fed. R. App. P. 35(a)(1).

## II.

With these principles in mind, I turn to the present federal habeas claim by 46-year-old Stephen Deck ("Deck") arising from his California state court conviction of attempt to commit a lewd or lascivious act on a child under the age of 14. *See* Cal. Penal Code §§ 288(a); 664. Defendant Deck began chatting online with a fictitious 13-year-old girl named "Amy." "Amy" was actually a volunteer working on a police sting operation targeted to identify and arrest adults using the internet to meet minors for sex. Deck identified himself in his online profile as a 46-year-old male who was "single and looking." Deck initiated contact with Amy by sending her a message stating, "Older for younger here." Amy responded positively, and the two began exchanging sexually suggestive messages nearly every day for a week. Throughout these chats, Deck called Amy "hot," a "hottie," "sexy," and "a little slutty." Deck said he wanted to "date" Amy, to take pictures of her, to "hold" her, and to "kiss" her. When Amy replied "that is what [boyfriends] and [girlfriends] do," Deck interjected, "[m]mm, yessss . . . [a]ll that and more . . . ." Deck said he wanted to perform oral sex on Amy, promising that it would feel "so good." Deck used the imagery of "eating pie" as an allusion to oral sex. Deck asked Amy about her own sexual experiences and how she "like[d] sucking cock?"

In arranging their first date, Deck—a lieutenant in the California Highway Patrol—expressed trepidation about meeting at Amy's apartment, indicating that he would "hate to walk into an apartment where I don't know – really who's

there" and told Amy that he needed to "make sure if it's real
. . . ." Ultimately, Amy and Deck decided to meet in a park
next to Amy's apartment. But in discussing what the pair
would do on their first date, Deck agreed they would "eat pie
and stuff and talk," and repeatedly suggested they "see what's
on TV" (presumably at Amy's house, not at the park). On the
day of the planned rendezvous, Deck claimed to have a "sore
throat." When Amy told Deck they would have to wait two
more weeks before Amy's mom would be "working" on a
weekend again (so that Amy would be home alone), Deck
decided to come over despite his illness to "say hi and meet
[Amy]." Just before signing off, Deck reminded Amy,
"Remember I am sick so no kissing or nothing. Just bringing
you your pie." But Deck also announced, "I probably won't
be able to keep my hands off of you." Deck drove 45 minutes
to Amy's house and arrived at 8:35 p.m. He parked in Amy's
apartment complex and walked to the park. Spotting a young
female, Deck approached and asked whether she was "Amy."
The female responded by asking whether he was "Steve."
When Deck acknowledged his identity, police arrested him.
Investigators searched Deck's person and found a digital
camera and a piece of pie. A search of Deck's vehicle
revealed a Mapquest printout with directions to Amy's
apartment and six expired condoms. Deck's home computer
contained sexually charged chat logs between Deck and two
other young girls with whom Deck had attempted to arrange
meetings.

## A.

Deck was charged in California state court with attempt
to commit a lewd or lascivious act upon a child. *See* Cal.
Penal Code §§ 288(a); 664. As applied to these facts,
California law required that Deck intended to "touch" Amy

on the night of the "date," though the touching need not appear sexual and could occur anywhere on Amy's body or through clothing. Deck's theory of defense at trial was that "like it or not the law [of attempt] is on Mr. Deck's side," because the prosecutor cannot show beyond a reasonable doubt that Deck intended to touch Amy *that night*. The prosecutor called the defense's theory "baloney," arguing that in the "defendant's own words," "he wouldn't be able to keep his hand off of [Amy]," and thus he "definitely" intended to touch Amy that night. The prosecutor emphasized that something as apparently benign as giving Amy a goodbye "hug," holding her hand, or posing her for photos would have qualified as "lewd" under § 288(a), given Deck's sexual intent. But, at one point, the prosecutor also argued (improperly): "I don't have to prove to you that [Deck] was going to commit a lewd act on . . . February 18th, 2006. . . . [E]ven if his intent was just to meet [Amy], get to know her, break the ice and follow up the next day, the next week, maybe [in] two weekends when Mom's gone . . . that is all I need." Defense counsel neither objected, nor moved to strike, nor asked for a curative instruction.

At the end of the parties' arguments, the judge properly instructed the jury that attempt in California requires an "immediate step" that "goes beyond planning or preparation" and "puts the [defendant's] plan into motion so that the plan would have been completed [absent some 'outside' circumstance]." On the first day of deliberations, a Thursday, the jury sent the judge a note, asking him to "clarify [the] law as it relates to whether defendant did not have to do anything that day only attempt to put it into play." This question prompted debate between counsel regarding the immediacy element of attempt. The judge requested supplemental briefing and dismissed the jury pending resolution of the

issue. The jury reconvened the following Tuesday, December 21, 2009, by which time one juror had fallen ill and been replaced by an alternate. The judge never answered the jury's original question—instead instructing the "new" jury to begin deliberating anew and inviting it to submit any "questions" it "want[ed] answered."[10] After 22 minutes of deliberation and without submitting any questions, the jury rendered a guilty verdict.

## B.

Deck appealed his conviction to the California Court of Appeal ("CCA"), arguing that the prosecutor's misstatement of law negated an essential element of attempt: that the attempted act was to occur that night. Moreover, Deck argued, his arrangement to meet Amy in a public park, combined with his statements that he was "sick" and just wanted to "say hi," made Deck's intent to commit a lewd act *on the night of the sting* too ambiguous to render the prosecutor's misstatement "harmless."[11] The CCA agreed that this small excerpt of the prosecutor's closing statement

---

[10] The judge said, "I know that there was a previous question sent out by the foreperson, Juror # 9. In light of the fact I have just given you this instruction that you have to start all over again, disregard past deliberations, you need to follow that instruction. If you have any further questions that you want answered once you start deliberating with the jury, send that out in the question format and we will answer it for you."

[11] He also asserted ineffective assistance of counsel based on defense counsel's failure to object.

was legally incorrect,**[12]** but found the error harmless for three reasons.

First, the CCA emphasized that § 288(a)'s "touching" requirement could be satisfied by a range of apparently non-sexual touching, like a seemingly "innocent hug" or "other . . . public" touching. *People v. Deck*, No. G043434, 2011 WL 2001825, at *10 (Cal. Ct. App. May 24, 2011) ("The 'controlling factor' is the defendant's intent when touching the minor, not the type of touching.'"). There was no reason why the requisite touching could not occur in a public park. *Id.* Nor did the fact that Deck planned to *meet* Amy in public mean that Deck intended to *remain* in public. *Id.* Deck had explained that he wanted to "make sure if it's real and you're there." Deck had told Amy earlier that day that the pair would watch TV on their date (presumably, not in the park) and eat "pie," a double entendre for oral sex. Deck arrived after dark with a camera. The standard for attempt is also not particularly onerous: California courts have found attempt where the defendant showed up at a public bus station to meet a minor before going to a hotel. *Id.* at *8 (citing *People v. Crabtree*, 169 Cal. App. 4th 1293, 1322–23 (2009)).

---

**[12]** The CCA specifically held that only the italicized excerpts were improper: "But even if his intent was just to meet her, get to know her, break the ice and follow the next day, *the next week, maybe [in] two weekends* when mom's gone . . . that is all I need. I don't need to prove to you that [Deck] was going to commit a lewd act on that day, *just some point in the future*." (alteration and italics in original)). The CCA held that the statement, "I do not have to prove to you that [Deck] was going to commit a lewd act on or about February 18th, 2006," "present[s] no problem" under California law; "after all, lack of success defines attempt." *People v. Deck*, No. G043434, 2011 WL 2001825, at *11 (Cal. Ct. App. May 24, 2011).

With these principles in mind, the CCA found "sufficient evidence" to prove that Deck intended to commit a lewd act on Amy on the night of the sting: Deck specifically sought out Amy because of her age ("Older for younger here"); Deck engaged in repeated, sexually explicit communications with Amy in which he indicated a clear desire to kiss, photograph, and perform oral sex on Amy (thus establishing that Deck possessed the requisite mental state to render *any* touching unlawful under § 288(a)); Deck used "eating pie" as a euphemism for oral sex, and told Amy on the day of the date that he would "bring her pie" and would probably not be able to keep his hands off her; Deck drove 45 minutes to Amy's house, while Amy was home alone, and while "ill," because he could not wait two more weeks to see her; Deck arrived at the park by Amy's house with a camera and condoms. *Id.* at *9. Given the "jury's role in assessing the credibility of Deck's statements," a "rational juror" could conclude that Deck's claims of illness and his insistence on meeting Amy outside were merely a "ploy" to verify Amy's age and identity. *Id.* Assuming "Amy" was real, Deck had every intention of "touching" her within the broad meaning of § 288(a). *Id.*

Second, the CCA noted, the prosecutor's closing argument properly focused "on Deck's clear intent . . . to commit a lewd act with the victim on the weekend he actually met with her." *Id.* at *12. The prosecutor's "errant gloss on the law of attempt" was an "isolated departure in a few stray words" from that theme. *Id.*

Third, the trial court properly instructed the jury, and California law presumes that the jury followed these instructions over any contrary statements by counsel. *Id.* at

\*12–13.**[13]**  Indeed, the judge specifically instructed the jury:
"You must follow the law as I explain it to you, even if you
disagree with it.  If you believe that the attorneys' comments
on the law conflict with my instructions, *you must follow my
instructions.*"  The jury's question did not justify abandoning
this presumption, the CCA explained, because the court could
presume that "having taken a fresh look [after the
weekend]—or a first look in the case of the new juror—at the
trial court's instructions, [the jury] had no further questions
for the trial court and reached a verdict."  *Id.* at \*13
("Consequently, there is no basis to conclude the jury
disregarded the trial court's instructions and instead fixated
on an isolated comment by the prosecutor.").  A fairminded
jurist could also conclude that, given the strong evidence
against Deck, any error was harmless.

---

**[13]** In full, the jury instructions regarding attempt provided:

> To prove that the defendant is guilty of [attempt to
> commit 288(a)], the People must prove that: (1) The
> defendant took a direct but ineffective step toward
> committing 288(a)[,] AND (2) [t]he defendant intended
> to commit 288(a).  A direct step requires more than
> merely planning or preparing to commit 288(a) or
> obtaining or arranging for something needed to commit
> 288(a).  A direct step is one that goes beyond mere
> planning or preparation and shows that a person is
> putting his plan into action.  A direct step indicates a
> definite and unambiguous intent to commit 288(a).  It
> is a direct movement towards the commission of the
> crime after preparations are made.  It is an immediate
> step that puts the plan in motion so that the plan would
> have been completed if some circumstance outside the
> plan had not interrupted the attempt.

For all these reasons, the CCA concluded, any misstatement by the prosecutor was harmless.

## C.

On habeas appeal, a federal magistrate judge reviewed the CCA's analysis at length and recommended that it was "neither an unreasonable application of, nor contrary to, clearly established federal law." *Deck v. Jenkins*, No. SACV 11-1767 MWF FFM, 2012 WL 6853245, at *11 (C.D. Cal. Nov. 7, 2012), *report and recommendation adopted*, No. SACV 11-1767 MWF FFM, 2013 WL 146351 (C.D. Cal. Jan. 14, 2013). The district court agreed and denied Deck's petition for relief, but granted a Certificate of Appealability ("COA") regarding the harmlessness of the prosecutor's misstatement of law. *Deck*, 2013 WL 146351, at *1.

A divided Ninth Circuit panel has reversed. *Deck v. Jenkins*, 768 F.3d 1015, 1017 (9th Cir. 2014). The Majority opined, as a threshold matter, that an error of constitutional magnitude had occurred (the prosecutor's misstatement violated Deck's right to due process under *Darden*). *Id.* at 1031. The Majority also concluded that it had "grave doubt" as to whether the prosecutor's misstatements were harmless under *Brecht*, and granted habeas relief on this basis. *Id.* Issuance of the court's mandate was thereafter stayed pending the outcome of *Davis v. Ayala*—which fundamentally contradicted the Majority's analysis. Nonetheless, the Majority stayed its course, reading Justice Alito's *reversal* of our grant of habeas relief in *Ayala* based on a bare application of *Brecht* as somehow affirming precisely the opposite: that the panel may grant habeas relief as long as it found "actual prejudice" under *Brecht*; no separate AEDPA analysis was required. *See* Slip Op. at 63–64. For the reasons set forth

below, neither the Majority's statement of the applicable legal standard, nor its analysis, can be squared with binding Supreme Court precedent.

## III.

### A.

The Majority's first error lies in its adoption of an approach to federal habeas review plainly reminiscent of the *Ayala* dissent. The *Deck* Majority holds: "A determination that [a constitutional] error resulted in 'actual prejudice' [under *Brecht*], *necessarily means* that the state court's harmlessness determination was not merely incorrect, *but objectively unreasonable. . . . A separate AEDPA/Chapman determination is not required*." Slip Op. at 63–64 (emphases added); *cf. Ayala*, 135 S. Ct. at 2211 (Sotomayor, J., dissenting) ("*Fry* expressly held that federal habeas courts need not first assess whether a state court unreasonably applied *Chapman* before deciding whether that error was prejudicial under *Brecht*. . . . If a trial error is prejudicial under *Brecht's* standard, a state court's determination that the error was harmless beyond a reasonable doubt is necessarily unreasonable.").

The legal standard Justice Sotomayor advanced in dissent is fundamentally inconsistent with that applied by the *Ayala* majority, and thus the *Deck* Majority erred in relying upon it. To start, Justice Sotomayor stated that the *Ayala* majority did nothing more than "simply restate[] the holding of *Fry v. Pliler*." *Id.* at 2211. That is simply not accurate—*Fry* did not involve an application of AEDPA. The issue in *Fry* was whether a federal habeas court should apply *Chapman de novo* (instead of *Brecht de novo*) where the state court had

"failed to recognize [any constitutional] error" and thus had not engaged in any harmless error analysis on direct review. *Fry v. Pliler*, 551 U.S. 112, 114 (2007). The *Fry* Court held that for reasons of "finality, comity, and federalism," a federal habeas court must apply *Brecht* on habeas review, even where the state court never applied *Chapman*. *Id.* at 116, 121–22. But the *Fry* Court had no occasion to consider the effect of AEDPA on *Brecht* where—as here—there *has been* a prior state-court finding of harmless error. Thus, Justice Sotomayor erroneously interpreted *Fry* when she suggested that the Court there held a finding of "prejudic[e] under *Brecht* . . . [renders] a state court's determination that the error was harmless beyond a reasonable doubt . . . necessarily unreasonable." *Ayala*, 135 S. Ct. at 2211.

In fact, the Supreme Court squarely confronted *and rejected* this very contention in *Davis v. Ayala*, *supra*, and *Harrington v. Richter*, 562 U.S. 86 (2011). In both cases, the Court emphasized that the *Chapman*/AEDPA standard *requires something more* than a traditional application of *Brecht*. *See, e.g.*, *Harrington*, 562 U.S. at 101–02 (rejecting this Circuit's conclusion that a finding of actual prejudice under *Brecht* satisfied AEDPA/*Chapman* and explaining that such a proposition must be incorrect—to hold otherwise would render AEDPA a nullity). The Majority's adoption of Justice Sotomayor's statement that *Chapman*/AEDPA is wholly redundant of *Brecht* is directly contrary to the central rule of *Davis v. Ayala* that *Chapman*/AEDPA sets forth a mandatory "precondition" to habeas relief. *Ayala*, 135 S. Ct. at 2198–99. It also contravenes the Supreme Court's instruction that "[u]nder § 2254(d), a habeas court *must* determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree

that those arguments or theories are inconsistent with the holding in a prior decision of this Court. . . . [That is] the *only question that matters* under § 2254(d)(1)." *Harrington*, 562 U.S. at 101–02 (emphases added) (internal quotation marks omitted) (reversing the Ninth Circuit's grant of habeas where the Ninth Circuit had applied *Brecht de novo*, found a *Strickland* violation, and "declared, without further explanation, that the 'state court's decision to the contrary constituted an unreasonable application of *Strickland*'").

True, as Justice Sotomayor and the *Deck* Majority have pointed out, the *Fry* Court did suggest that *Chapman*/AEDPA was "more liberal" (*i.e.* more petitioner-friendly) than *Brecht*. *See Fry*, 551 U.S. at 119–20; *see also* Slip Op. at 63–64.[14] But not only was this dicta, it has since been discredited by *Harrington* and again by *Ayala*. Indeed, the *Ayala* majority stated point-blank: "The *Fry* Court did not hold—and would have had no possible basis for holding—that *Brecht* somehow abrogates the limitation on federal habeas relief that § 2254(d) plainly sets out. While a federal habeas court need not 'formal[ly]' apply both *Brecht* and 'AEDPA/*Chapman*,' AEDPA nevertheless 'sets forth a precondition to the grant of habeas relief.'" *Ayala*, 135 S. Ct. at 2198. That *Fry's* dicta has not survived subsequent precedents is borne out by the fact that it would have mandated the opposite outcome in *Davis v. Ayala*. If—as Justice Sotomayor and the *Deck*

---

[14] That is, in *rejecting* Ayala's argument that AEDPA demonstrated a Congressional desire that federal courts apply *Chapman de novo* in the absence of a prior state court harmlessness analysis, the *Fry* Court suggested: "[I]t is implausible that, without saying so, AEDPA replaced the *Brecht* standard of 'actual prejudice,' . . . with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." *Fry v. Pliler*, 551 U.S. 112, 119–20 (2007) (internal quotation marks omitted).

Majority insist—a finding of "actual prejudice" under *Brecht*
"necessarily means" that the state's court's finding of
harmlessness was unreasonable, then our Circuit's finding of
actual prejudice under *Brecht* would have entitled Ayala to
habeas relief. Yet that is *exactly* what was rejected in
*Ayala*.[15] The *Deck* Majority's reliance on Justice
Sotomayor's dissent is therefore fundamentally unsound.

## B.

The Majority's erroneous conclusion that we apply the
same *Brecht* test irrespective of whether a state court has
previously found a claimed constitutional error harmless
beyond a reasonable doubt also appears to stem from a
misinterpretation of the word "subsumes." In delivering the
opinion of the *Ayala* Court, Justice Alito explained that "a
prisoner who seeks federal habeas corpus relief must satisfy
*Brecht*, and if the state court adjudicated his claim on the
merits, the *Brecht* test *subsumes* the limitations imposed by
AEDPA." *Ayala*, 135 S. Ct. at 2199 (emphasis added). From
the word "subsumes," the *Deck* Majority concludes that
*Brecht* somehow already incorporates AEDPA deference
thereby eliminating the need to conduct an independent
*Chapman/*AEDPA analysis. *See* Slip Op. at 63–64. But read
in light of the *Ayala* Court's *reversal* of our holding that a
*Brecht* analysis alone could support a grant of habeas relief,
the word "subsumes" cannot possibly have the meaning

---

[15] I concede that there is tension between the dicta in *Fry* (though not its
holding) and the holdings of *Harrington* and *Ayala*. As such, we are
required to follow binding, *on-point* precedents (*Ayala* and *Harrington*)
over stray, discredited dicta in an off-point case (*Fry*). Justice
Sotomayor's advancement of a standard based on a rejected statement in
*Fry*—a non-AEDPA case—simply cannot be squared with the standard
articulated and applied by the *Ayala* majority.

ascribed to it by the *Deck* Majority. Indeed, *Brecht pre-dates* AEDPA. It is thus historically and logically impossible that *Brecht* already incorporates AEDPA deference. And the very fact that Justice Alito *distinguished* between the traditional *Brecht* analysis and the analysis we must undertake "if the state court [*has* previously] adjudicated [the prisoner's] claim on the merits" only confirms that the Majority's interpretation of the word "subsumes" to mean "eliminates," rather than "incorporates," is incorrect. More fundamentally, the Majority ignores the common-sense meaning of the word, which Merriam Webster defines as "to include or place within something larger or more comprehensive, [*e.g.*,] . . . red, green, and yellow are subsumed under the term 'color.'" *See Subsume*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/subsume (last visited Nov. 6, 2015). Red, green, and yellow do not stop being individual and different colors simply because they are "subsumed" in the broader term "color." Neither do AEDPA limitations cease to exist when "subsumed" under *Brecht*.

True, as the *Deck* Majority also pointed out, the Court's opinion in *Ayala* suggested that a habeas court need not "formally" apply both *Brecht* and *Chapman*/AEDPA. But as the Court's *analysis* demonstrates, the lack of a procedural process does not make the *Chapman*/AEDPA standard any less of a requirement. *See, e.g.*, *Ayala*, 135 S. Ct. at 2202–05.

## C.

As the *Ayala* Court made plain, *Chapman*/AEDPA provides a "precondition" to relief, *see id.* at 2198, and it is *Brecht's* standard that "necessarily" cannot be met "if a fairminded jurist could agree with the [CCA's] decision that [the prosecutor's error] met the *Chapman* standard of

harmlessness," *id.* at 2199.[16]  And unlike *Brecht's* standard, which permits a grant of habeas relief as long as the *appellate court* would find harmful error, AEDPA deference requires a finding that the prosecutor's misstatement was not harmless under "*any* reasonable application" of "clearly established" Supreme Court precedent before habeas relief may be afforded. *See Panetti v. Quarterman*, 551 U.S. 930, 948, 953 (2007) (emphasis added).  In other words, it is not enough that the state's harmlessness determination was incorrect; *Chapman*/AEDPA requires that the *application* of Supreme Court precedent to the particular facts before the court be so clearly established that the state court's determination was objectively "unreasonable."  *Id.*  And before a court of appeals may find unreasonableness, it must consider not only the many "arguments or theories" that the state court actually offered, but also any that "could have supported" its determination.  *See Harrington*, 562 U.S. at 102.  Here, the Majority did not do this.  To be sure, it cursorily cited to parts of the CCA's opinion, but only to lay a foundation for its own analysis and counterarguments—namely, that (1) the prosecutor's misstatement went to the core of Deck's defense,

---

[16] Dissenting in *Ayala*, Justice Sotomayor argued that the Supreme Court in *Fry* had previously "expressly held that federal habeas courts need not first assess whether a state court unreasonably applied *Chapman* before deciding whether that error was prejudicial under *Brecht*."  *Ayala*, 135 S. Ct. at 2211 (Sotomayor, J., dissenting).  That is a distortion of *Fry*, where the only question presented was whether a federal habeas court should apply *Brecht* or *Chapman* where the state court "*failed to recognize the error* and did *not* review it for harmlessness under . . . *Chapman*."  *Fry*, 551 U.S. at 114, 117–120 (emphases added).  Because there had been no state court determination of harmless error, the *Fry* court had no occasion to consider the interaction between *Brecht* and AEDPA where a state court *had* made a *Chapman* harmlessness determination.  That was the question put in *Davis v. Ayala*.

and (2) the jury's question reflected confusion on that very issue. *See* Slip Op. at 51–60.

For example, the Majority recognized that the CCA "emphasized that only minimal physical contact was required to support a conviction for a lewd act." *Id.* at 61. It also acknowledged that "Deck conceded that although he wanted to meet in public for their first date and not engage in sexual activity, [he said,] 'I probably won't be able to keep my hands off of you.'" *Id.* at 61. But rather than asking whether any fairminded jurist could find the CCA's arguments based on such evidence persuasive, the Majority stated, "*[o]n the other hand*, the same evidence suggests the jury *could have* based its verdict on the prosecutor's alternative theory that Deck intended to commit lewd acts on Amy not on the night of the meeting, but on some unspecified future date." *Id.* at 61–62 (emphases added). *The Majority therefore asked the wrong question*: Whether the evidence "could be" susceptible to another determination is irrelevant where there has been a prior state court determination. *See Harrington*, 562 U.S. at 101. Rather, the *only* proper question on collateral review of a merits determination is whether *any* fairminded jurist could agree with the state court. *Id.* at 102. When the state court's reasons for finding harmlessness constitute a reasonable basis for the state court's determination, a federal court's review is accomplished: It must deny habeas relief. Here, the *Deck* Majority concluded that, because *it* thought that Deck's trial was "fundamentally unfair," no fairminded jurist could disagree. Slip Op. at 62, 63–64. This cursory citation to *Chapman*/AEDPA's "fairminded jurist" test does not redeem the Majority's analysis, which is bereft of any AEDPA deference, nor its adoption of a plainly erroneous legal standard. In sum, the *Deck* Majority's analysis is,

unfortunately, precisely backwards. That does not satisfy AEDPA.

### D.

The Majority's disregard for AEDPA is further belied by its failure to cite a single Supreme Court case that actually found constitutional error based on prosecutorial misconduct, particularly where the jury was properly instructed. *See* Slip Op. at 47–49. Indeed, every Supreme Court[17] case involving prosecutorial misconduct cited by the Majority found such error harmless and denied habeas relief. *See Boyde v. California*, 494 U.S. 370, 386 (1990) (denying habeas relief based on prosecutorial commentary that might mislead jury to adopt an improperly narrow interpretation of jury instructions),[18] *Darden v. Wainwright*, 477 U.S. 168, 181–82

---

[17] The Majority also flouts AEDPA to the extent it purports to rely on Ninth Circuit precedent—which is inapposite under AEDPA. *See Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (For purposes of AEDPA, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"); *see also* 28 U.S.C. § 2254(d)(1) (expressly requiring that the state court's determination involve an unreasonable application of "clearly established Federal law, *as determined by the Supreme Court of the United States*" (emphasis added)).

[18] In *Boyde*, the jury instructions stated, in relevant part, that the jury could consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." *Boyde v. California*, 494 U.S. 370, 373–74 (1990). The petitioner argued that these instructions were ambiguous as to whether the jury could consider evidence of the defendant's "background and character" (as opposed to only "crime-related" mitigation evidence) in sentencing proceedings. *Id.* at 378, 384. The petitioner also urged that the prosecutor's statements immediately before deliberations that "[n]othing I have heard lessens the seriousness of this crime" encouraged the narrower (and incorrect) understanding of the instruction. *Id.* at 385, 404. In finding no constitutional violation and *denying* habeas relief, the Court noted that

(1986) (denying habeas relief and holding that numerous "undoubtedly" "improper" comments by the prosecutor were not enough to deprive the petitioner of a fair trial);[19] *Weeks v. Angelone*, 528 U.S. 225, 227, 237 (2000) (denying habeas relief where, instead of answering the jury's question, the judge directed the jury to a constitutionally sufficient instruction, thus arguably failing to resolve the jury's confusion). It is a weak reed indeed to rely on precedents that found *harmless* error in analogous circumstances to urge they can render the same finding by the CCA "objectively unreasonable"—such that "no fairminded jurist could agree" with it.

Ultimately, the *Deck* Majority appears to rely solely on the general principle that a prosecutor's misstatement *could* amount to a prejudicial constitutional violation if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (nonetheless finding that the prosecutor's numerous "improper" statements did *not* meet this standard). And while

"arguments of counsel generally carry less weight with a jury than do instructions from the court . . . . [and] must be judged in the context in which they were made." *Id.* at 384–86 (passage cited by the *Deck* majority). Nothing about *Boyde* renders the CCA's analysis "objectively unreasonable."

[19] In *Darden*, the prosecutor suggested that the death penalty would be the only guarantee that the defendant would not commit another heinous crime in the future, that the defendant was an "animal," that the defendant should not be let out of his prison cell without a "leash," and that the prosecutor wished the defendant's face had been "blown off" by a shotgun. *See Darden v. Wainwright*, 477 U.S. 168, 179–80, nn.9–12 (1986). These inflammatory statements, although clearly constituting prosecutorial misconduct, did not so irretrievably "infect" the trial with unfairness so as to violate due process.

the Majority is correct that *Darden* provides the relevant[20] law for purposes of AEDPA, *see* Slip Op. at 46–47, the question under AEDPA is whether the prosecutor's misstatement violated Deck's due process rights under "any reasonable application of [*Darden*]." *See Panetti v. Quarterman*, 551 U.S. 930, 948, 953 (2007).[21] In other words, even assuming *arguendo* that the broad standard to be applied here is "clearly established," its *application* to the present facts certainly is not. *See supra*, n.21.

If anything, clearly established Supreme Court precedent supports the *CCA's* application. For example, in denying habeas relief, *Boyde* explained that "arguments of counsel generally carry less weight with a jury than do instructions from the court. . . . [and] must be judged in the context in which they are made." *Boyde*, 494 U.S. at 384–85 (selection quoted by *Deck* Majority, Slip Op. at 49). Here, the CCA noted the overwhelming focus of the prosecutor's lengthy closing argument: that Deck *did* intend to "touch" Amy on

---

[20] The majority's cherry-picked citation to *Parker v. Matthews*, 132 S. Ct. 2148 (2012), to support its position that *Darden's* "highly generalized" standard is "clearly established" for the purposes of AEDPA, is misleading. *Parker* merely affirmed that AEDPA's reference to "clearly established law" refers only to *Supreme Court* precedent—not to any *individual Circuit's* precedent. *See Parker*, 132 S. Ct. at 2153 ("The 'clearly established Federal law' relevant here is our decision in *Darden v. Wainwright* . . . ."). Nothing about *Parker* suggests that *Darden's* application to new fact patterns will always—or even often—be so "clearly established" as to render a state court's opinion "unreasonable."

[21] *Panetti* provides an example of "clearly established" law where a state court's application of law was "unreasonable" since the petitioner was indisputably incompetent and had been denied the process mandated by controlling Supreme Court precedent for incompetent defendants. *Panetti*, 551 U.S. at 952–53.

the night of their date. *See Deck*, 2011 WL 2001825, at \*12. The CCA reasoned that the prosecutor's misstatement was an "isolated departure [from that theme] in a few stray words." *Id.* Its finding that, in context, the prosecutor's misstatement was harmless is consistent with *Boyde's* holding and analysis. *Id.*

Likewise, it is clearly established that "[a] jury is presumed to follow its instructions." *Weeks*, 528 U.S. at 234 (selection also quoted by the *Deck* Majority). Here, it is undisputed that Deck's jury was "properly instructed" on the relevant principles of attempt *after* the prosecutor's misstatement regarding the law of attempt. The judge also instructed the jury to follow these instructions over "conflict[ing] statements of counsel." True, the instructions did not expressly state that the jury must find an intent to touch Amy *on the first night*. But both *Boyde* and *Weeks*, held that a jury is presumed to have understood and correctly applied jury instructions that are "not concededly erroneous"—even if the instructions are not "pin point." *See, e.g.*, *Boyde*, 494 U.S. at 380, 384–86 (in a *capital* proceeding, the Eighth Amendment is not violated absent a "reasonable likelihood" that the jury incorrectly interpreted its jury instructions as precluding consideration of mitigating evidence). In *Weeks*, for example, the jury submitted a question about whether it had a "duty," or merely discretion, to impose the death penalty. *Weeks*, 528 U.S. at 229. Instead of answering the jury's question directly, the judge pointed the jury to "Instruction #2." *Id.* The Supreme Court found that, because the jury instructions were accurate and "constitutionally adequate," the jury's failure to seek additional clarification—even on an issue as important as whether or not to apply the death penalty—must be presumed to indicate that the jury understood and properly applied its

instructions.  *Id.* at 234 ("To presume otherwise would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer.").  The state court's finding of no constitutional error was therefore not an unreasonable application of clearly established law under section 2254(d).  *Id.* at 237.

Similarly in *Deck's* case, the jury received accurate jury instructions.[22]  It is a reasonable reading of *Weeks* to hold that the failure of Deck's newly constituted jury to re-submit its question regarding the immediacy element of attempt compels, or at least supports, a presumption that the jury understood its instructions and no longer needed clarification. *See id.* at 234 (reasoning that it is enough that "[h]ad the jury desired further information," it "probably" would have submitted another question).  In fact, the application of *Weeks'* presumption is even more clear here, because the trial court actually invited Deck's jury to re-submit its question, *see supra*, n.10, yet the jury still failed to do so.

---

[22] It is worth noting that—notwithstanding the supposed centrality of the prosecutor's misstatement to Deck's defense—Deck's counsel did not object to the misstatement, move to strike it, or request a pin-point instruction that the jury was required to find Deck had made an attempt to touch "Amy" *that night*.  The defense's failure to seek any corrective action corroborates the CCA's view that the prosecutor's misstatement of law was merely an "isolated departure . . . in a few stray words."  *Deck*, 2011 WL 2001825, at *12.  In fact, it was only after the jury's question that the parties began debating this finer point of California law.  Even then, the question was so close that, after briefing and significant argument, the trial judge was prepared to resolve it in the *prosecutor's* favor.  On appeal, the CCA disagreed, but held that only two short clauses of the prosecutor's argument misstated California law.  *See id.* ("The prosecutor erred, however, by suggesting an intent to engage in a lewd act at 'just some point in the future' or 'the next week, maybe [in] two weekends' sufficed." (alteration in original)).

In any event, the CCA could reasonably have concluded that the evidence against Deck was so strong that the jury would have found him guilty irrespective of the judge's answer to its question. *Darden* itself emphasized that strong evidence against a petitioner "reduce[s] the likelihood that [a] jury's decision was influenced by [a prosecutor's improper] argument." *Darden*, 477 U.S. at 182. Here, the CCA found "ample evidence . . . to support the jury's finding [that] Deck attempted to commit a lewd act with 'Amy'" on the night in question. Deck referred to Amy as "hot," a "hottie," "sexy," and "slutty"; he told Amy he wanted to date her, to kiss her, to perform oral sex on her, and to do other sex acts that "boyfriends and girlfriends" do. Deck's stated intention to "see what's on TV" on the first date, coupled with his arrival after dark with a camera, strongly supports an inference that Deck intended to go to Amy's apartment after he had confirmed that she was "real." Deck's supposedly exculpatory statements that he was "sick" and that he was "just bringing [Amy] pie" do not compel a contrary conclusion. Deck had previously used "pie" as an allusion to oral sex. A fairminded juror could readily conclude that Deck—being a law enforcement officer—used the euphemism in setting up his first meeting with Amy to "create a defense" for himself (as the prosecutor argued) until he had confirmed that Amy was real. Likewise, a fairminded juror could be highly skeptical of Deck's claim that he was "ill," given Deck's ensuing decision to drive 45 minutes to Amy's house ostensibly just to "say hi."

In sum, the CCA's analysis was a patently reasonable application of clearly established Supreme Court precedent. Had the Majority applied *Ayala* and AEDPA properly, it could not have reached its result. Of course, were it reviewing these facts *de novo*, the panel might disagree with

the CCA.  In fact, the *Deck* Majority makes a good argument
in that regard.  But that is not the question on collateral,
habeas review.  As Judge M. Smith argues persuasively in his
dissent, "an *unreasonable* application of federal law is
different from an *incorrect* application of federal law" and
that "the majority commits the same error the Supreme Court
has criticized our court for making time after time by
'collapsing th[is] distinction . . . ." *Deck*, 768 F.3d at 1031
(quoting *Nevada v.* Jackson, 1133 S. Ct. 1990, 1994 (2013)).
It is this kind of disregard for binding Supreme Court
precedent, Judge M. Smith explained in dissent, that has led
the Supreme Court "in its four most recent terms . . . [to]
reverse[] us fourteen times in cases involving our application
of AEDPA . . . ten of which reversals have been unanimous."
*Id.*

As shown above, none of the precedents cited by the *Deck*
Majority compel a finding that the prosecutor's misstatement
was prejudicial under "any reasonable application" of
*Darden's* very general standard, *see Panetti*, 551 U.S. at 948,
953, and all in fact *support* the CCA's analysis.  To reach a
contrary conclusion, the *Deck* Majority adopts an analytical
approach that the Supreme Court this year expressly
rejected—adopting Justice Sotomayor's dissent to hold that
a federal court's *de novo* finding of "actual prejudice"
"necessarily"  renders  the  state's  court's  contrary
determination "unreasonable."

## IV.

The *Deck* Majority's analysis cannot be squared with
*Davis v. Ayala*, 135 S. Ct. 2187 (2015).  Because this Court's
failure to correct the Majority's error through re-hearing *en*

*banc* perpetuates both an intracircuit and intercircuit split, I respectfully dissent from denial of re-hearing *en banc*.

---

## OPINION

CHRISTEN, Circuit Judge:

Stephen Deck was convicted in California of one count of an attempted lewd act upon a child under the age of 14. After exhausting review of his conviction in state court, he petitioned the federal district court for habeas relief under 28 U.S.C. § 2254, arguing that prosecutorial misstatements made during rebuttal closing argument deprived him of a fair trial. The district court dismissed Deck's petition. We reverse the district court's judgment and remand for further proceedings.

## BACKGROUND

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), "state court findings of fact are presumed correct unless rebutted by clear and convincing evidence." *Gonzales v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). Both Deck and the State agree that the California Court of Appeal (CCA) correctly framed the underlying facts of the case. Our opinion relies on, and quotes at length from, the CCA's opinion in *People v. Deck*, No. G043434, 2011 WL 2001825 (Cal. Ct. App. May 24, 2011).

## The Alleged Crime

In February 2006, the Laguna Beach Police Department collaborated with volunteers from an organization called Perverted Justice "on a sting operation to identify and arrest adults using the Internet to meet minors for sex." *Id.* at *1. "After online conversations confirmed the adult's intent, . . . decoys arranged a meeting between the adult and fictitious minor at an apartment," where the adult would be arrested. *Id.*

Deck, who was then a lieutenant with the California Highway Patrol, began chatting online with a fictitious girl named "Amy."[1] *Id.* Amy represented to Deck that she was 13 years old, and her online profile included a photograph of an actual 13-year-old girl. *Id.* The two exchanged sexually suggestive messages, and Deck expressed an interest in taking photographs of Amy. *Id.* at *1–2. They arranged a meeting for an upcoming Saturday. *Id.* at *2. Amy asked Deck to come to her apartment, but Deck said he was "not comfortable meeting at your house" and proposed meeting in public. *Id.* "Deck also suggested that after their first date, if their chemistry remained as good as it seemed during their chats, they would arrange another date and engage in some of the sexual activity they discussed online." *Id.* But he said: "'I probably won't be able to keep my hands off of you.'" *Id.* On the day of their planned meeting, Deck claimed not to be feeling well but "promised to stop by [Amy's] apartment for their first meeting," at a time when Amy's mother was not around. *Id.* at *3. In a subsequent online chat, he asked Amy to meet him "in a public place close to her apartment." *Id.*

---

[1] We use "Amy" to refer to the Perverted Justice volunteer who played this role.

He said he would be bringing her a piece of pie.[2]  *Id.*  "Before signing off his computer, Deck added, 'Remember I am sick so no kissing or nothing.  Just bringing you your pie.'"  *Id.*

The CCA opinion described what happened next:

> Deck made the 45 mile drive from his residence to "Amy's" apartment, arriving around 8:35 p.m.  He parked in the apartment complex's parking lot and walked to the park for his rendezvous with "Amy."  Spotting a young female sitting at a picnic table in the park, Deck approached and asked whether she was "Amy."  The female responded by asking whether he was "Steve."  When Deck acknowledged his identity, the police arrested him.

> Investigators searched Deck and found a digital camera and the piece of pie he promised to bring "Amy."  They also searched Deck's car, where they found a MapQuest printout with directions to "Amy's" apartment and six packaged condoms past the listed expiration date.

*Id.*

---

[2] In online messages, Deck had repeatedly used the term "pie" as a euphemism for performing a sex act.

## Procedural History

Deck was charged with attempt to commit a lewd or lascivious act ("lewd act") upon a child. The CCA explained that, under California law:

> An attempt to commit a lewd act upon a child requires both an intent to arouse, appeal to, or gratify "the lust, passions, or sexual desires of [the defendant] or the child" "and . . . a direct if possibly ineffectual step toward that goal . . . ."

> For an attempt, the overt act must go beyond mere preparation and show that the [defendant] is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes, nor need it satisfy any element of the crime. However, as we have explained, "[b]etween preparation for the attempt and the attempt itself, there is a wide difference. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made." "[I]t is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made."

*Id.* at \*7 (alterations in original) (citations omitted). Deck was convicted after a jury trial and sentenced to 365 days in county jail and five years formal probation.

One of Deck's arguments to the CCA was that the prosecutor's rebuttal closing argument misstated the law of attempt. *Id.* at \*11. The CCA agreed, but held that the prosecutor's "lone misstatement" of the law was rendered harmless by the trial court's correct jury instructions. *Id.* Because the issue in this appeal is highly fact-specific, it is worth providing the CCA's description and analysis of the prosecutor's error in (close to) its entirety.

The CCA first summarized the prosecutor's statements as follows:

> On rebuttal, the prosecutor agreed with defense counsel that "I need to prove to you that [Deck] took a direct, but ineffectual step on or about February 18, 2006." Deck focuses on a handful of ensuing comments as the basis for his misconduct claim that the prosecutor misstated the law of attempt.

> Specifically, Deck zeroes in on four sentences, italicizing a few of the prosecutor's words in just two sentences of his closing argument, as follows: "I don't have to prove to you that he was going to commit a lewd act on or about February 18th, 2006 . . . . [¶] But even if his intent was just to meet her, get to know her, break the ice and follow the next day, *the next week, maybe [in] two weekends* when mom's gone, again, as long as he took a direct, but ineffectual step towards that goal, that is all I need. [¶] I don't need to prove to you that he was going to commit a lewd act on that day, *just some point in the future* direct

and ineffectual step that day [sic: garbled diction] . . . . He was on that day going to commit a lewd act with Amy." (Italics added.)

*Id.* at \*11 (alterations in original) (citations omitted).

The CCA next discussed whether the prosecutor's statements were erroneous:

In this excerpt isolated by defendant, the prosecutor's first and final sentences present no problem. First, the prosecutor did not have to prove Deck "was going to commit" a lewd act with "Amy" in the sense that he would be successful; after all, lack of success defines an attempt. As the prosecutor explained just a few sentences later: "I don't have to prove to you that he was going to actually succeed in committing the lewd act on that day." And, in defendant's excerpt, the prosecutor's final sentence properly focused the jury's attention on the day he met with "Amy," emphasizing, "He was *on that day* going to commit a lewd act with Amy." (Italics added.) This was the prosecutor's repeated emphasis, arguing several times, for example, that defendant was "[d]efinitely going down there to engage in a lewd act, lewd contact with Amy"; "If Amy was a real 13–year–old girl, [in] the defendant's own[] words, he wouldn't be able to keep his hands off of her"; "He was on that day going to commit a lewd act with Amy";

and characterizing the idea that Deck would "just see her that day" as "baloney."

*Id.* (alterations in original).

The CCA concluded that the prosecutor misstated the law: "Deck argues the prosecutor in his closing argument misstated the law of attempt. He did . . . ." *Id.* The CCA explained:

The prosecutor erred . . . by suggesting an intent to engage in a lewd act at "just some point in the future" or "the next week, maybe [in] two weekends" sufficed. As our Supreme Court has explained, to establish an attempt the defendant's overt act "must go beyond mere preparation and show that the [defendant] is putting his or her plan into action." Indeed, the acts of the defendant must go *so far that they would result in the accomplishment of the crime unless frustrated by extraneous circumstances*.

. . . .

Here, pushing defendant's intent to commit a lewd act on "Amy" to, potentially, "next week" or in "two weekends" or to "just some point in the future" negates the essential element necessary to constitute an attempt . . . . The merely speculative possibility of a potential future rendezvous is inconsistent with the inevitable nature of an attempt, where the offense will be accomplished "'unless

> frustrated by extraneous circumstances'" or
> "'absent an intervening force.'"

*Id.* at *12 (alterations in original) (citations omitted).

Having decided that the prosecutor's misstatements of California law negated an essential element of attempt, the CCA concluded that the misstatements were not prejudicial to Deck:

> [T]he prosecutor's errant gloss on the law of attempt does not require reversal. First, it was an isolated departure in a few stray words and not the focus of the prosecutor's argument, which properly remained on Deck's clear intent, coupled with the steps he took, to commit a lewd act with the victim on the weekend he actually met with her.
>
> More importantly, the trial court properly instructed the jury on the relevant principles. The court instructed the jury the necessary "direct step" to constitute an attempt "requires more than merely planning or preparing to commit" the target offense, but instead "goes beyond planning or preparation" with a "direct movement towards the commission of the crime *after* preparations are made."

*Id.* (citation omitted).

The CCA reasoned that, based solely on these jury instructions:

[T]he jury knew it was not enough to plan or prepare to commit a lewd act at a potential *later* rendezvous. Rather, the attempt must consist of "an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt." We presume the jury followed these instructions.

*Id.*

The CCA recognized that Deck's argument relied heavily on the jury's request for clarification of the law relating to the prosecutor's closing rebuttal argument:

[A]bout an hour into deliberations, the jury sent the trial court a note asking it to "'[c]larify [the] law as it relates to whether defendant did not have to do anything that day, only attempted [sic] to put it into play.'" The trial court excused the jury an hour early for the weekend recess to discuss the matter with counsel, and then excused the jury after only an hour of deliberation on Monday because defense counsel became ill. At the outset of deliberations on Tuesday, the trial court seated an alternate juror to replace a juror who had called in sick.

The trial court had discussed with counsel how to respond to Friday's jury note but, given deliberations had to begin anew with the substitute juror, the trial court instructed the jury as follows: "I know that there was a

previous question sent out by the foreperson, Juror # 9. In light of the fact I have just given you this instruction that you have to start all over again, disregard past deliberations, you need to follow that instruction. If you have any further questions that you want answered once you start deliberating with the jury, send that out in the question format and we will answer it for you."

*Id.* at \*13.

Finally, the CCA reasoned that the jury's failure to resubmit its question (or a similar one) after restarting deliberations demonstrated the jury was not misled by the prosecutor's misstatements:

The jury, presumably having taken a fresh look—or a first look in the case of the new juror—at the trial court's instructions, had no further questions for the trial court and reached a verdict. Deck does not dispute the trial court's instructions concerning attempt correctly stated the law. We must presume the jury understood and followed those instructions. Consequently, there is no basis to conclude the jury disregarded the trial court's instructions and instead fixated on an isolated comment by the prosecutor.

*Id.*

The CCA's version of events contains most of the details relevant to this appeal, but three additional points are helpful.

First, Deck's trial defense was that Deck, a California Highway Patrol Officer, approached his initial meeting with Amy cautiously and lacked the mental intent to engage in a lewd act "on that date." Defense counsel emphasized this point heavily during his closing argument. The prosecutor recognized the importance of this defense argument and told the judge that the purpose of his rebuttal was to dispute it. Second, though the CCA described the prosecutor's misstatements as an "isolated departure in a few stray words," there was another important misstatement by the prosecutor during rebuttal: "Even if you buy this baloney just see her that day, not touching her, stay five feet away from her, follow up the next day if they got along, then commit the lewd act, that is sufficient under the law for the defendant to be guilty." Third, the trial court never instructed the jury that, in order to convict, it was required to find beyond a reasonable doubt that Deck had moved beyond preparation on the night he was arrested and would have committed a lewd act that night, but for his arrest.

Deck filed a petition for review to the California Supreme Court, which denied review. Deck then filed a petition in federal court for writ of habeas corpus pursuant to 28 U.S.C. § 2254. A federal magistrate judge recommended dismissal of the petition with prejudice, and the district court adopted the magistrate's findings and recommendations. Deck appeals.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 2253. We review the district court's denial of Deck's § 2254 habeas corpus petition de novo. *Gonzalez v. Duncan*, 551 F.3d 875, 879 (9th Cir. 2008). Looking through the district court's decision,

we examine the last reasoned state-court decision, which in this case is the opinion of the CCA. *See Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003).

The CCA decided that "pushing defendant's intent to commit a lewd act on 'Amy' to, potentially, 'next week' or in 'two weekends' or 'just some point in the future' negate[d] the essential element necessary to constitute an attempt." *Deck*, 2011 WL 2001825, at *12. In other words, the CCA established that a trial error occurred through the prosecutor's misstatement of California law. *See Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (prosecutorial misconduct is a trial error). We do not review this ruling, nor do we review the state court's interpretation of the California law of attempt as applied to Deck's case. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Whether a trial error amounts to a constitutional violation depends on the extent to which it renders the proceedings unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A constitutional trial error does not warrant reversal if "it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). On habeas review, we must evaluate whether the CCA's decision "was contrary to, or involved an unreasonable application of, [this] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**DISCUSSION**

**I. The CCA's determination that no constitutional violation occurred was an unreasonable application of clearly established federal law.**

**A. Clearly established federal law provides that a prosecutor's improper comments amount to a constitutional violation if they rendered the trial fundamentally unfair.**

It is clearly established under Supreme Court precedent that a prosecutor's "misleading . . . arguments" to the jury may rise to the level of a federal constitutional violation. *Sechrest v. Ignacio*, 549 F.3d 789, 807 (9th Cir. 2008) (citing *Darden*, 477 U.S. at 181–82); *see also Allen v. Woodford*, 395 F.3d 979, 997 (9th Cir. 2005) (citing *Darden* for conclusion that improper prosecutorial argument may violate federal constitutional rights). The Supreme Court recently reaffirmed that *Darden* is the "clearly established Federal law" relating to a "prosecutor's improper comments" for purposes of AEDPA review. *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012).[3] The "clearly established Federal law" from *Darden* is that a prosecutor's improper comments amount to a constitutional violation if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting

---

[3] The dissent suggests that we treat *Parker* itself as "clearly established Federal law." In fact, we cite *Parker* to illustrate that the rule from *Darden* is clearly established—and was at the time of the state court's decision. *See Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000) (recognizing that persuasive authority "may help us determine what [Supreme Court] law is 'clearly established'").

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985). The Court has acknowledged that "the *Darden* standard is a very general one," *Parker*, 132 S. Ct. at 2155, but AEDPA "recognizes . . . that even a general standard may be applied in an unreasonable manner," *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). A federal court may find "an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'" *Id.* (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

We recognize that "clearly established federal law" for purposes of AEDPA review includes only "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012)). Therefore, we do not construe the reasoning used in prior Supreme Court decisions as an "elaborate, multistep test." *Parker*, 132 S. Ct. at 2155. No single consideration should be treated as either necessary or sufficient to reach a decision. *See id.* at 2155–56 (holding appellate court's use of multistep test for unconstitutionality of prosecutorial misconduct improperly departed from the "highly generalized standard" in *Darden*).

Holding that a condemnatory closing argument did not deprive the petitioner in *Darden* of a fair trial, the Supreme Court reasoned that the prosecutor "did not manipulate or misstate the evidence" and that the trial court properly instructed the jury "that the arguments of counsel were not evidence." 477 U.S. at 181–82. The Court also considered the "heavy" weight of the evidence against the petitioner, which "reduced the likelihood that the jury's decision was influenced by argument." *Id.* at 182.

The Supreme Court elsewhere observed that:

> arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. *And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made*.

*Boyde v. California*, 494 U.S. 370, 384–85 (1990) (emphasis added) (citations omitted). We recognize that "[a] slight misstatement of law by a prosecutor can be rendered harmless by the court's proper instruction to the jury." *United States v. Mendoza*, 244 F.3d 1037, 1045 (9th Cir. 2001). And under Supreme Court precedent, a jury is presumed to follow the trial court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

## B. The CCA implicitly ruled that the prosecutor's misstatements did not amount to a constitutional violation.

The heading of the relevant section of the CCA's decision analyzing the prosecutor's rebuttal closing argument was: "The Prosecutor's Misstatement Concerning Attempt Was Harmless." The CCA agreed with Deck that the prosecutor misstated the law of attempt but held that "this lone misstatement—counteracted by the trial court's correct instructions—was harmless."[4] *Deck*, 2011 WL 2001825, at *11. We accept the CCA's interpretation of California law and take as established that prosecutorial error occurred. The CCA did not expressly reach the question whether this error amounted to a violation of federal due process, so we must consider whether the CCA's harmlessness determination amounted to an implied ruling that no federal constitutional violation took place.

The Supreme Court has defined a "fair trial" as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Hein v. Sullivan*, 601 F.3d 897 (9th Cir. 2010), our court summarized the factors the Supreme Court evaluated in *Darden* to determine whether the petitioner's trial was "fair," and then observed that consideration of the *Darden* factors "appears to be equivalent to evaluating whether there was a 'reasonable probability' of a different result." *Id.* at 914–15. California courts use the "reasonable probability" standard to evaluate whether prosecutorial misconduct renders a trial fundamentally unfair under state law. *See People v. Partida*,

---

[4] As explained below, the prosecutor's error was more than a single "lone misstatement," but this point is not relevant here.

122 P.3d 765, 771 (Cal. 2005); *People v. Espinoza*, 838 P.2d 204, 212 (Cal. 1992). We therefore conclude that, although the CCA did not independently evaluate the federal constitutional question, its harmlessness analysis can be seen as an implied ruling that no federal constitutional violation occurred because the prosecutor's error was harmless.[5]

## C. The CCA's conclusion was unreasonable.

To be entitled to habeas relief, it is not enough for Deck to show that the CCA's determination that no constitutional violation occurred was "incorrect or erroneous." He must show the CCA's determination was "objectively unreasonable." *Lockyer*, 538 U.S. at 75. A state court determination is objectively unreasonable only when "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Because the prosecutor's misstatements were not inadvertent or isolated; because the jury was never correctly instructed that, in order to convict, it had to find Deck had moved beyond preparation and would have engaged in a lewd act with Amy the night he was arrested; and because the evidence concerning the temporal aspect of Deck's intent was not overwhelming, we conclude this stringent standard has been met.

### 1. The prosecutor's misstatements were not inadvertent or isolated.

In its analysis of prejudice, the CCA reasoned that "the prosecutor's errant gloss on the law . . . . was an isolated

---

[5] The dissent reaches the same conclusion.

departure in a few stray words and not the focus of the prosecutor's argument." *Deck*, 2011 WL 2001825, at \*12. But it is clear the erroneous assertions of law in the prosecutor's closing rebuttal argument were not mere "stray words," they were a direct response to the central theory of Deck's case. *See* 28 U.S.C. § 2254(e)(1).

The contention that Deck did not intend to commit a lewd act on the night of the meeting was absolutely central to his defense. In closing argument, defense counsel told the jury that, while Deck's conduct may have been reprehensible, it did not constitute attempt. He stressed that Deck's defense was a technical one, telling the jury that this was a case where law and justice might not be "on the same side" and "don't necessarily meet." Defense counsel expressly argued to the jury that "Mr. Deck never had the intent in the first place to engage in a lewd act" on the date of the meeting, and that "Mr. Deck had a definite and unambiguous intent *not* to engage in a lewd act *on that date*" (emphasis added). Leaving no doubt that the jury would be required to examine the precise elements of the law of attempt in California, defense counsel argued: "Like it or not[,] the law is on Mr. Deck's side in this case. Like it or not." Whether Deck had advanced beyond mere preparation and intended to commit a lewd act on the night of the meeting was not a side issue in his trial; it went to the heart of Deck's defense, and his counsel made this abundantly clear to the jury.

The prosecutor's statements about the purpose of his rebuttal closing argument contradict the CCA's description of his misstatements as stray words. After the jury sent its note requesting clarification on the temporal requirement of Deck's intent, the prosecutor claimed that his rebuttal was

necessary to convey the State's position on what the law required the State to prove:

> The Court: You did not object at all to [defense counsel's] argument.  He clearly argued to the jury that [Deck] had to commit a lewd act that day, that he had the intent to do that.
>
> [Prosecutor]: *That is what my rebuttal was for.  I am arguing what the law is*.

(emphasis added).  The prosecutor's view that the law did not require him to prove Deck intended to engage in a lewd act on the night of the meeting is *precisely* the one the CCA later rejected.

There is no doubt the trial court recognized that the defense and prosecution made directly conflicting statements to the jury regarding what the jury had to find to convict Deck, and that the court's written instructions did not address the issue.  Because this question was pivotal to Deck's defense, the trial judge stated that he would "even entertain additional closing argument on [the] issue based on the fact that there were two different things argued to the jury."  The judge observed that it was "not surprising" that the jury asked for clarification in light of this difference.

The CCA's characterization of the prosecutor's misstatements as brief and errant departures from an otherwise sound argument is contradicted by the record.  The State's rebuttal unambiguously repeated several erroneous statements regarding what California law required to convict Deck.  The misstatements were the counterpunch to Deck's

"like it or not" closing argument. The prosecutor told the jurors that although the evidence showed Deck intended to engage in lewd conduct that night, they could convict Deck *even if they agreed with the defense that the evidence raised reasonable doubt about when Deck would have followed through*:

> But even if his intent was just to meet her, get to know her, break the ice and follow up the next day, the next week, maybe two weekends when mom's gone, again, as long as he took a direct, but ineffectual step towards that goal, that is all I need.
>
> I don't need to prove to you that he was going to commit a lewd act on that day, just some point in the future [sic] direct and ineffectual step that day. So the best case scenario for the defense is baloney. . . . Even if you buy this baloney[,] just see her that day, not touching her, stay five feet away from her, follow up the next day if they got along, then commit the lewd act, that is sufficient under the law for the defendant to be guilty.

The prosecutor's repetition of the phrase "even if" unquestionably shows that he presented alternative theories of the case on which the jury could rely to convict Deck, rather than making a passing incorrect statement of his primary argument. The prosecutor's unequivocal assertions—"that is all I need" and "that is sufficient under the law for the defendant to be guilty"—leave no doubt he was arguing, incorrectly, that the jury could still convict Deck

even if it had doubt about whether Deck intended to engage in a lewd act on the night of the meeting.

The unequivocal manner in which the prosecutor presented his alternative theory, using statements like "sufficient under the law," created a significant likelihood that the comments would be "viewed as definitive and binding statements of the law," rather than merely as argument. *See Boyde*, 494 U.S. at 384. We need not engage in speculative Monday morning quarterbacking to know the rebuttal argument may have seriously misled the jury; the jury's note to the trial court after the start of deliberations went straight to this contested point of law. It asked the court to "[c]larify law as it relates to whether defendant did not have to do anything that day only attempt to put it into play." In other words, the jury asked whether it needed to find that Deck would have committed a lewd act on the night of the meeting. But as explained in the next section, the trial court never clarified this point of California law.

> **2. The trial court never correctly instructed the jury that, in order to convict, it had to find Deck had moved beyond preparation and intended to engage in a lewd act on the night of the meeting.**

"Arguments of counsel which misstate the law are subject to objection and to correction by the court," *id.*, but here the trial court did not correct the prosecutor's misstatements; the written instructions said nothing about the temporal component of the State's burden. Nor did the court answer the question posed in the jury's note, because the jury was subsequently told to start deliberations over after a juror became sick and had to be excused. Notably, even the trial

court did not expect the jury to find the answer to its question in the written set of jury instructions. The record shows the judge anticipated the jury would ask the same question, and the court was diligently reviewing the applicable California case law and working with counsel to draft a response when the jury reached a verdict. That the trial court did not issue a correction before the verdict was returned weighs in favor of finding a constitutional violation, because, as we have recognized, improper prosecutorial statements cannot be neutralized by instructions that do not in any way address "the specific statements of the prosecutor." *United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005) (quoting *United States v. Kerr*, 981 F.2d 1050, 1054 (9th Cir. 1992)).

The CCA emphasized that "the trial court properly instructed the jury on the relevant principles" of the law of attempt. *Deck*, 2011 WL 2001825, at \*12. The written instructions made it clear that the State needed to prove Deck: (1) "took a direct but ineffective step toward committing" the crime; and (2) "intended to commit" the crime. The instructions explained that a direct step "is a direct movement towards the commission of the crime *after preparations are made*" (emphasis added). The CCA held that this instruction correctly stated the law, and we do not review this holding.[6]

---

[6] The instructions elaborated in full:

> A direct step requires more than merely planning or preparing to commit [the offense] or obtaining or arranging for something needed to commit [the offense]. A direct step is one that goes beyond planning or preparation and shows that a person is putting his plan into action. A direct step indicates a definite and unambiguous intent to commit [the offense]. It is a direct movement towards the

*See Bradshaw*, 546 U.S. at 76.

But the CCA went on to conclude, based on the written instructions alone, that "the jury knew it was not enough to plan or prepare to commit a lewd act at a potential *later* rendezvous." *Deck*, 2011 WL 2001825, at \*12. Reasonable jurists could not disagree that this conclusion does not comport with the record. The instructions entirely failed to address the specific misstatements made by the prosecutor. Counsel made diametrically opposing statements to the jury about whether the law required the State to show that Deck intended to commit a lewd act on the night of the meeting, and the instructions were silent on this point. The jury could have concluded that the instructions were perfectly compatible with the prosecutor's repeated assertions that Deck could be found guilty even if the meeting was merely a step in a plan to commit a lewd act "the next day, the next week, maybe [in] two weekends" because the prosecutor told the jury that, under the State's alternative theory, it was sufficient if the jury found the purpose of the initial meeting was to confirm Amy's identity before arranging a future sexual encounter.

The CCA's conclusion that the jury correctly understood the law of attempt is further undermined by the differing interpretations of the law adhered to by the trial court and counsel. The prosecutor believed the instructions permitted his view of the law, but the CCA later held that the prosecutor

---

commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstances outside the plan had not interrupted the attempt.

was wrong. Defense counsel insisted the law required more. Tellingly, the trial judge sided with the prosecutor and not the defense. After going round and round on the issue with counsel outside the presence of the jury, the judge stated:

> [M]y analysis of it after reading [California] cases is that the People are correct in their analysis of the law. *I do not think it has to be, the ultimate step, intend to commit it that day*. He had to have the specific intent to commit the lewd act at or about the time he took the direct step. That doesn't mean he had to have the intent to commit child abuse that day, on that particular day. I think that is accurate. But it's very, very difficult to phrase that in an instruction format that it's clean and that's understandable. *I mean if the lawyers can't even agree, how do we expect jurors or layperson to grasp it*[?]

(emphases added). The italicized sentences in this statement encapsulate a separate problem with the CCA's analysis. The CCA decided "the jury knew it was not enough to plan or prepare to commit a lewd act at a potential *later* rendezvous," *id.*, but it is difficult to imagine "the jury knew" something from the jury instructions that even the trial judge who gave the instructions did not know.

The trial judge and counsel plainly agreed that the jury's question was not addressed by the court's written instructions, and they expected the jury to come back with another version of its initial question after it restarted deliberations with the new juror. Working to craft an answer to the question when the bailiff announced there was a

verdict, the court seemed surprised that the jury could have reached a verdict without having its earlier question answered:

> The Bailiff: There's a verdict, your Honor.
>
> The Court: There is a verdict?
>
> The Bailiff: Yes.
>
> The Court: Well, that solves that issue.

The dissent relies on the presumption that a jury understands and follows the court's instructions. We recognize the existence of this well-established presumption, but it is not dispositive here for a simple reason the dissent fails to acknowledge: the jury instructions on attempt did not address the temporal issue that was the gravamen of the prosecutor's misstatements. The instructions did say that to be convicted of attempt, the defendant must put his "plan in motion so that the plan would have been completed if some circumstances outside the plan had not interrupted the attempt." But this provided no guidance as to whether, in order to convict Deck, his plan would have to be completed that night, or, as the prosecutor incorrectly told the jury, Deck merely had to put in motion a plan to complete the act "the next day, the next week, maybe two weekends [later]." The trial judge's interpretation of the instructions in a manner inconsistent with the CCA's determination of California law vividly illustrates that, even if the jury read the instructions carefully and made their best effort to follow them, they could no more than guess at the correct rule of California law. To be clear, we do not believe the jury failed to follow the trial court's directions in the sense that it *disregarded* the

court's instructions. Rather, the record shows that the most diligent of juries would have had no way of divining whether the prosecutor's interpretation of the law of attempt was incorrect from the instructions given to them.[7]

### 3. The evidence concerning the temporal aspect of Deck's intent was not overwhelming.

In *Darden*, the Supreme Court reasoned that overwhelming evidence "reduced the likelihood that the jury's decision was influenced by" the prosecutor's improper argument in that case. 477 U.S. at 196. The weight of the evidence against Deck is an important consideration, but it does not change the outcome on the facts presented here. Because fairminded jurists could not disagree that the prosecutor's misstatements went to the heart of Deck's defense, and the trial court never correctly instructed the jury that—contrary to the prosecutor's misstatements—in order to convict it had to find beyond a reasonable doubt that Deck had moved beyond preparation and intended to engage in a lewd act with Amy on the night of the meeting, fairminded jurists could reach no conclusion other than that the CCA's finding of no constitutional violation was unreasonable. *See Harrington*, 562 U.S. at 102.

---

[7] Deck's case is analogous to cases where the jury has been "instructed on multiple theories of guilt, one of which is improper." *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008). Here, the prosecutor and defense counsel gave contradictory interpretations of the law of attempt, and the instructions themselves did not resolve the contradiction. Under these circumstances, we agree with what our dissenting colleague wrote in a previous decision: "While we presume jurors follow the instructions they are given, we cannot equally assume they can sort out legal contradictions." *Doe v. Busby*, 661 F.3d 1001, 1023 (9th Cir. 2011) (M. Smith, authoring judge).

The jury could have found Deck intended to engage in lewd touching with Amy on the night of the meeting: he had previously discussed performing sexual acts with her in graphic detail, he knew that her mother was not at home, and he had condoms in his car. As the CCA observed, "A rational juror reasonably could conclude Deck's comments [about feeling sick, wanting to meet in public, and cautioning 'no kissing or nothing' at the meeting] served merely as a ploy to convince 'Amy' to meet him or as a prudent precaution Deck took to verify 'Amy's' age and identity." *Deck*, 2011 WL 2001825, at \*9. By bringing a piece of pie with him, Deck could argue that his earlier message was not intended to convey a sexual overtone. Deck's background as a lieutenant with the California Highway Patrol made it more likely that he was playing it safe in his communications with Amy to avoid exactly this type of sting. The prosecutor argued along these lines in closing rebuttal that Deck "knew what the defense was" to the charge and "tried to create his own defense."

The CCA also emphasized that only minimal physical contact was required to support a conviction for committing a lewd act. The intended touching need not have been overtly sexualized to an outside observer. *Id.* at \*10 ("[T]he jury need only have found Deck intended to touch 'Amy' with the intent to arouse himself or her."). In an earlier chat discussion, Deck conceded that although he wanted to meet in public for their first date and not engage in sexual activity, "I probably won't be able to keep my hands off of you." *Id.* at \*2.

On the other hand, the same evidence suggests the jury could have based its verdict on the prosecutor's alternative theory that Deck intended to commit lewd acts with Amy not

on the night of the meeting, but on some unspecified future date. The jury may have believed Deck wanted to avoid contact with Amy on the night he was arrested because he was grooming Amy for future contacts and wanted to exercise caution by having a more limited first meeting, in public, to assess the situation and avoid a sting. The jury might even have believed that Deck did not intend contact or touching on that particular night because he was ill, as he claimed. That Deck was carrying a camera and had condoms in his car shows preparation, but these facts do not establish when he planned to follow through. The prosecutor's assurance that the jury could convict "even if" it believed the prosecution's alternative theory of the case may have influenced the jury to find "attempt" based on an anticipated future rendezvous with Amy. The jury's note suggests at least some jurors were on the fence about this question. And as explained, the trial court never instructed the jury with respect to this issue.

Based on the foregoing, we hold that fairminded jurists could reach only one conclusion: the prosecutor's uncorrected misstatements of the law rendered Deck's trial fundamentally unfair, in violation of his clearly established constitutional rights.

## II. The constitutional violation was prejudicial.

Our inquiry does not end with the conclusion that the CCA's finding of no constitutional error was unreasonable. As explained, even on direct review a constitutional trial error will not warrant reversal if it was harmless beyond a reasonable doubt. *See Chapman*, 386 U.S. at 24. In a collateral proceeding, the test is more forgiving to the prosecution. Habeas petitioners are not entitled to relief

based on trial error unless the error resulted in "actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under th[e] [*Brecht*] test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 2197–98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)); *see also O'Neal*, 513 U.S. at 437 (defining "grave doubt" as being in "virtual equipoise as to the harmlessness of the error").

Because it is more stringent, the *Brecht* test "subsumes" the AEDPA/*Chapman* standard for review of a state court determination of the harmlessness of a constitutional violation. *Fry v. Pliler*, 551 U.S. 112, 120 (2007). A federal habeas court therefore need not formally apply both the *Brecht* test and the AEDPA standard; it is sufficient to apply *Brecht* alone. *Id.* A determination that the error resulted in "actual prejudice," *Brecht*, 507 U.S. at 637, necessarily means that the state court's harmlessness determination was not merely incorrect, but objectively unreasonable, *Davis*, 135 S. Ct. at 2198–99. A separate AEDPA/*Chapman* determination is not required.

As explained, under clearly established Supreme Court law, the constitutional dimension of the prosecutor's misstatements turns entirely on the issue of prejudice: the error rises to the level of *Darden* error only if there is a reasonable probability that it rendered the trial fundamentally unfair. Our analysis of prejudice therefore overlaps completely with our analysis of the CCA's constitutional determination. We conclude no fairminded jurist could agree with the CCA's harmlessness determination, and that the

prosecutor's misstatements resulted in "actual prejudice." *See id.* at 2203.

The CCA's decision established that the prosecutor gave incorrect direction to the jury about an element of California law under which Deck was convicted. The record establishes that the comments were not inadvertent or isolated, and it cannot be questioned they went to the heart of Deck's defense. The lawyers' diametrically opposed statements of the law in closing arguments clearly confused the jury, as evidenced by the jury's request for clarification. The jury's note asked the trial court to "clarify [the] law as it relates to whether defendant did not have to do anything that day[,] only attempt to put it into play."[8] Even the State concedes on appeal that "on some level, [the prosecutor's] statements resonated with the jury in that they provoked a question from the jury."

Rather than disputing that the prosecutor's closing rebuttal argument perplexed the jury, the State contends the jury's failure to resubmit its question to the trial court after restarting its deliberations suggests "the jury was satisfied with the original, correct instructions on the crime of attempt when it rendered its verdict." The judge orally directed the jury:

> I know that there was a previous question sent
> out by the foreperson, Juror # 9. In light of
> the fact I have just given you this instruction

---

[8] The jury's request for clarification on the law of attempt also included the following language, which was crossed out near the top of the blank space: "In closing arguments, Prosecutor . . . [illegible] . . . we need it read back."

> that you have to start all over again, disregard past deliberations, you need to follow that instruction. If you have any further questions that you want answered once you start deliberating with the jury, send that out in the question format and we will answer it for you.

*Deck*, 2011 WL 2001825, at \*13. The CCA accepted that the jury satisfied itself about what Deck needed to have intended to do the night he met Amy by looking at the trial court's written instructions. *Id.* But when the jury resumed its deliberations, it worked from the same written instructions the original jury had, and they provided no guidance on the pivotal question.

Without the benefit of a correct statement of the law, the jury may have arrived at the same erroneous legal conclusion that the trial judge reached: that Deck could be convicted even if the jury was not sure whether he intended to commit a lewd act on the night he met Amy. After all, that is precisely what the prosecutor told the jury in rebuttal. Under these circumstances, a fairminded jurist could not conclude that the jury found beyond a reasonable doubt that Deck moved beyond preparation to commit a lewd act with Amy on the night of the meeting. Further, we are left with "grave doubt" as to the harmlessness of the constitutional trial error that occurred in Deck's case. *See O'Neal*, 513 U.S. at 437–38.

## CONCLUSION

The prosecutor's misstatements regarding an element of the crime amounted to constitutional trial error under clearly established federal law as determined by the Supreme Court.

*See Darden*, 477 U.S. at 181. The misstatements lowered the prosecution's burden of proof, and therefore resulted in "actual prejudice." *See Davis*, 135 S. Ct. at 2197. In view of these conclusions, we **REVERSE** the judgment of the district court and **REMAND** with instructions to grant the petition unless the State agrees to grant Deck a new trial within a reasonable period of time. *See Stark v. Hickman*, 455 F.3d 1070, 1080 (9th Cir. 2006).

**REVERSE AND REMAND.**

M. SMITH, Circuit Judge, dissenting:

I respectfully dissent.

The Supreme Court has repeatedly—and often unanimously—reversed our circuit's decisions granting § 2254 relief. For example, in its four most recent terms, the Supreme Court has reversed us fourteen times in cases involving our application of AEDPA, 28 U.S.C. § 2254, ten of which reversals have been unanimous. Most recently, the Supreme Court reversed us in *Davis v. Ayala*, 135 S. Ct. 2187 (2015), reminding us of the difficult hurdle that petitioners must surmount in order for a federal court to reverse a state court's determination that a trial error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). In my view, this case is yet another candidate for reversal because the majority flouts clear Supreme Court AEDPA precedent in order to justify its holding that a state court's decision is incorrect. In so doing, the majority commits the same error the Supreme Court has criticized our court for making time after time by "collapsing the distinction between 'an *unreasonable*

application of federal law' and what [the majority] believes to be 'an *incorrect* or *erroneous* application of federal law.'" *Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)) (unanimously reversing our grant of habeas relief).[1]

---

[1] *See also Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curiam) (unanimously reversing our grant of habeas relief and criticizing our court for "[our] mistaken belief that circuit precedent may be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced"); *Cavazos v. Smith*, 132 S. Ct. 2, 6–8 (2011) (per curiam) (reversing our grant of habeas relief and stating: "This Court vacated and remanded this judgment twice before, calling the panel's attention to this Court's opinions highlighting the necessity of deference to state courts in § 2254(d) habeas cases. Each time the panel persisted in its course, reinstating its judgment without seriously confronting the significance of the cases called to its attention . . . . Its refusal to do so necessitates this Court's action today."); *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011) (per curiam) (unanimously reversing our grant of habeas relief and stating: "The short of the matter is that the responsibility for assuring that the constitutionally adequate procedures governing California's parole system are properly applied rests with California courts, and is no part of the Ninth Circuit's business."); *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (unanimously reversing our grant of habeas relief and criticizing us for "treat[ing] the unreasonableness question as a test of [our] confidence in the result [we] would reach under *de novo* review"); *Premo v. Moore*, 562 U.S. 115, 127 (2011) (unanimously reversing our grant of habeas relief and criticizing us for "transpos[ing]" Supreme Court precedent "into a novel context"); *Knowles v. Mirzayance*, 556 U.S. 111, 121–23 (2009) (unanimously reversing our grant of habeas relief and reminding us that "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court" (internal quotation marks omitted)); *Brown v. Payton*, 544 U.S. 133, 147 (2005) (reversing our grant of habeas relief and commenting that we had "no basis for . . . concluding that the [state court's] application of [the Supreme Court's] precedents was objectively unreasonable" (internal quotation marks omitted)).

## I.  Background

As the majority explains, Deck engaged in online conversations with a fictitious thirteen-year-old named Amy. The trial record shows that Deck and Amy exchanged sexually suggestive messages and that they planned to meet in person to "date" and to engage in sexual acts. Deck indicated that he would not feel safe meeting for the first time at Amy's home, so they arranged to meet initially at a nearby park.

The day of their planned meeting, Deck told Amy that he was sick, and said: "so no kissing or nothing. [I'm] [j]ust bringing you . . . pie." During their prior online conversations, Deck had repeatedly used the term "pie" as a euphemism for performing oral sex on Amy. Moreover, although Deck stated that he and Amy would not engage in sexual conduct at their first meeting, he also told Amy "I probably won't be able to keep my hands off of you."

On February 18, 2006, Deck drove forty-five minutes to meet Amy at the park near her home. Deck arrived around 8:35 p.m., and when he identified himself to a teenage girl, the police arrested him. A subsequent search of Deck's car revealed, among other things, MapQuest directions to Amy's apartment, six packaged condoms, and a digital camera. Deck was charged with one count of an attempted lewd act on a child under the age of fourteen and tried before a jury.

During his closing argument, the prosecutor argued that Deck was guilty of an attempted lewd act on a child because: (1) if Amy had been a real thirteen-year-old, Deck would have touched her on February 18, 2006, and (2) in light of Deck's express intent to engage in sexual conduct with Amy,

"any touching" would have constituted a lewd act under California law.

Throughout his closing argument, the prosecutor discussed his understanding of attempt under California law. The prosecutor's explanation was not a model of clarity, nor was it entirely accurate. The prosecutor first stated,

> I need to prove to you that [Deck] took a direct, but ineffectual step . . . . First of all, his intent was to commit a lewd act. Definitely going down there to engage in a lewd act, lewd contact with Amy. But for that sting operation and Amy being fictitious . . . he would have [engaged in a lewd act].

The prosecutor also stated: "But even if [Deck's] intent was to just meet her, get to know her, break the ice and follow up the next day, the next week, maybe two weekends when mom's gone, again, as long as he took a direct, but ineffectual step towards that goal, that is all I need."

Defense counsel did not object to the prosecutor's closing argument, but instead offered his own explanation of attempt during his closing remarks. Before the jury started its deliberations, the presiding judge correctly instructed the jury concerning the law of attempt, as follows:

> A direct step requires more than merely planning or preparing to commit [the offense] or obtaining or arranging for something needed to commit [the offense]. A direct step is one that goes beyond planning and preparation and shows that a person is putting

his plan into action. A direct step indicates a definite and unambiguous intent to commit [the offense]. It is a direct movement towards the commission of the crime after preparations are made. *It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstances outside the plan had not interrupted the attempt.*

(emphasis added).

On direct appeal, Deck argued, among other things, that his conviction should be reversed because the prosecutor misstated the law of attempt in his closing argument. The California Court of Appeal for the Fourth District (Court of Appeal) agreed that the prosecutor was incorrect when he stated: "[E]ven if [Deck's] intent was to just meet [Amy], get to know her, break the ice and follow up the next day, the next week, maybe two weekends when mom's gone, again, as long as he took a direct, but ineffectual step towards that goal, that is all I need." The Court of Appeal further explained that to be guilty of attempt under California law, "the acts of the defendant must go so far that they would result in the accomplishment of the crime unless frustrated by extraneous circumstances."

While the Court of Appeal held that the prosecutor misstated the law of attempt, the Court nevertheless affirmed Deck's conviction. In so doing, the Court of Appeal held that the prosecutor's legal error did not require reversal because the judge correctly instructed the jury. The Court explained: "[W]e presume the jury followed [the trial judge's] instructions . . . . [Thus], the jury knew it was not enough to

plan or prepare to commit a lewd act at a potential *later* rendezvous[, and that] the attempt must consist of 'an immediate step that puts the plan in motion so that the plan would have been completed if some circumstances outside the plan had not interrupted the attempt.'" According to the majority, the Court of Appeal's holding is an unreasonable application of clearly established federal law. I respectfully disagree.

## II.  Clearly Established Law

The majority contends that Deck is entitled to habeas relief, because (1) the prosecutor inadvertently misstated California law in his closing argument, and (2) the majority has "grave doubt" as to whether this misstatement affected the outcome of Deck's trial. But whether the majority has "grave doubt" about whether a trial error was harmless is only relevant if that error amounts to a constitutional violation. *See O'Neal v. McAninch*, 513 U.S. 432, 435–36 (1995). When a state court has previously determined that no such constitutional error occurred, a federal court "ha[s] no authority" to disrupt the state court's holding unless the state court's holding is "'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Parker v. Mathews*, 132 S. Ct. 2148, 2151 (2012) (per curiam) (quoting 28 U.S.C. § 2254(d)).

The Supreme Court has also emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *See, e.g.*, *Harrington*, 562 U.S. at 101 (quoting *Williams*, 529 U.S. at 410). "The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so

obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706–07 (2014) (quoting *Harrington*, 562 U.S. at 102).

Importantly, even if a federal court would grant relief to a § 2254 petitioner under a *de novo* review, a state court's denial of relief is not necessarily unreasonable. *Harrington*, 562 U.S. at 101–02. This is so, because "[u]nder § 2254(d), a habeas court must [first] determine what arguments or theories supported or . . . could have supported, the state court's decision," and then "'[t]*he only question that matters*' . . . [is] whether it is possible [that] fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*. at 102 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)) (emphasis added).

The majority's opinion rests on its conclusion that a defendant's right to due process of law is violated when the prosecutor misstates the law in his closing argument, even when the judge correctly instructs the jury on the relevant legal principles. While the majority may believe that federal law *should* protect a criminal defendant from prosecutorial errors of this nature, the Supreme Court has never announced such a rule.

The majority correctly observes that the Supreme Court has stated that prosecutorial misconduct *may* deny a criminal defendant due process of law. But the only Supreme Court decisions the majority cites for this proposition are *Parker*, 132 S. Ct. at 2154–55 (holding that § 2254 relief was not proper because the alleged prosecutorial error was not a clearly established constitutional violation), *Darden v.*

*Wainwright*, 477 U.S. 168, 179–83 (1986) (same), and *Caldwell v. Mississippi*, 472 U.S. 320, 339–40 (1985) (holding that the Eighth Amendment is violated when the prosecutor *and the court* erroneously instruct the jury that the responsibility for determining whether a death sentence is appropriate lies with the court of appeals and not with the jury).

While *Parker*, *Darden*, and *Caldwell* all state that prosecutorial misconduct could render a trial so unfair as to deny a defendant due process of law, in none of these cases did the Supreme Court actually hold that a prosecutor's error denied a criminal defendant due process, nor did the Court establish what type of misconduct would cause a trial error of constitutional magnitude.

*Critically, the Supreme Court has never held, nor even suggested, that a defendant's constitutional rights are violated where a prosecutor misstates the law in closing argument, but the trial judge correctly instructs the jury. In fact, the Supreme Court has indicated just the opposite.*

The Supreme Court has long held that "[a] jury is presumed to follow" a judge's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). This is true even when a party provides contrary instructions. For example, in *Brown v. Payton*, 544 U.S. 133 (2005), the prosecutor repeatedly and incorrectly argued to the jury that it could not consider certain mitigating evidence in the penalty phase of the defendant's trial for capital murder. The court failed to provide a corrective instruction, but correctly instructed the jury on the applicable law before deliberations began. *Id.* at 146–47. In so doing, the trial court did not instruct the jury that the prosecutor's statements were incorrect. *Id.* It merely provided

a correct explanation of the law, which was inconsistent with the prosecutor's erroneous statements. *Id.*

The *Brown* Court (reversing our court, sitting en banc) held that the petitioner was not entitled to relief under § 2254. Although the Supreme Court acknowledged that the trial court "should have [explicitly] advised the jury that it could consider [the mitigating] evidence," it was not unreasonable for the state court to conclude that the jury relied on the judge's correct instructions, rather than on the prosecutor's misstatements. *Id.* at 146–47. As in *Brown*, the state trial court here did not explicitly instruct the jury that the prosecutor was incorrect when he stated that the jury could convict Deck even if it concluded that Deck did not intend to touch Amy for several days or weeks after their initial meeting. Nonetheless, the court offered an instruction that directly contradicted the prosecutor's erroneous explanation, when it explained that a defendant is only guilty of attempt if he "[makes a] direct movement towards the commission of the crime after preparations are made[, by] putt[ing his] plan in motion so that the plan would have been completed if some circumstances outside the plan had not interrupted the attempt."

Despite *Brown*, the majority concludes that the Supreme Court's broad statements that a prosecutor's comments can render a trial constitutionally infirm grant this court authority to set aside the Court of Appeal's holding that no such error occurred in this case. This conclusion flouts AEDPA's deferential standard.

The majority is correct that under § 2254 even a general rule can be applied in an unreasonable manner. This is so, because "[c]ertain principles are fundamental enough that

when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *White*, 134 S. Ct. at 1706 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)). But, even where a general rule is at issue, "relief is available under § 2254(d)[] . . . if, and only if, it is so obvious that [the] clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White*, 134 S. Ct. at 1706–07 (quoting *Harrington*, 562 U.S. at 102). "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state court decision.'" *White*, 134 S. Ct. at 1706 (quoting *Yarborough*, 541 U.S. at 666).

Under the Supreme Court's case law, it will rarely be "so obvious" that a prosecutorial error violated a defendant's due process rights that there could be no "'fairminded disagreement' on the question." *White*, 134 S. Ct. at 1706–07 (quoting *Harrington*, 562 U.S. at 102). In *Parker*, the Supreme Court specifically addressed this issue and warned that because the standard for determining whether prosecutorial error amounts to a constitutional error "is a very general one . . . [we must give state] courts more leeway . . . in reaching outcomes in case-by-case determinations [concerning prosecutorial conduct]." 132 S. Ct. at 2155 (internal quotation marks omitted); *see also Harrington*, 562 U.S. at 101 ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

Here, there is simply no Supreme Court precedent establishing "beyond fairminded disagreement" that Deck's due process rights were violated. The Supreme Court has generally acknowledged that prosecutorial misconduct may,

under some circumstances, amount to a due process violation. But the Court has never suggested that a prosecutor's inadvertent misstatement of state law creates such a circumstance, particularly where the judge later provides the jury with a correct explanation of the law. For this reason, the Court of Appeal's holding that the prosecutor's erroneous statements of law did not violate Deck's constitutional rights is not "an unreasonable application of . . . clearly established law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

## III.    Prejudice

Not only does the majority grant habeas relief based on a new constitutional rule that it announces today, but it compounds its error by rejecting the Court of Appeal's reasonable conclusion that any prosecutorial error was not prejudicial. This holding relies on an interpretation of the facts that is tenuous at best.

It is well-settled law that "[a] jury is presumed to follow . . . [and] is [also] presumed to understand" a judge's instructions. *Weeks*, 528 U.S. at 234. Here, it is undisputed that the presiding judge correctly instructed the jury that a defendant is only guilty of attempt if he "[makes a] direct movement towards the commission of the crime after preparations are made[, by] putt[ing his] plan in motion so that the plan would have been completed if some circumstances outside the plan had not interrupted the attempt." In order to overcome the presumption that the jury understood and followed this instruction, and to show that the prosecutor's statements were prejudicial, the majority adopts a strained interpretation of the record. With respect, the

majority's interpretation is neither persuasive nor consistent with the scope of AEDPA review.

The majority notes that during its deliberations, the jury asked the court to "clarify [the] law as it relates to whether defendant did not have to do anything that day only attempt to put it in play." After the jury submitted this question, the jury adjourned for the day. When the jury reconvened, an alternate juror was substituted for a sick juror. The judge properly instructed the jury to begin its deliberations anew, and to submit any outstanding questions to the court. The new jury did not resubmit the original jury's question, and it was never answered.

According to the majority, the jury's unanswered question proves that (1) despite the judge's correct instruction, the jury believed the prosecutor's conflicting statement that it could convict Deck even if it found that Deck did not intend to touch Amy for several days or weeks after their initial meeting, and (2) the jury convicted Deck on these grounds. In my view, the majority's reading is unfounded and does nothing to overcome the presumption that a jury understands and follows a judge's instructions. *Id*.

Inchoate offenses are undoubtedly confusing to a lay jury. Recognizing this potential for confusion, the fairest interpretation of the jury's question is a simple request for confirmation that a defendant may be guilty under the law of attempt even if he does not complete a substantive offensive—"only attempt[s] to put it in play." Contrary to the majority's reading, nothing about the jury's note indicates that the jury believed that Deck could be guilty of attempt even if he did not intend to touch Amy for several days or weeks following their initial meeting. Rather, the note focuses

on what *actions* one must take (i.e., what he must "do") to be guilty of attempt.

The majority points to no other record evidence indicating that the jury relied on the prosecutor's erroneous statements, rather than on the judge's correct explanation of the law. Thus, I find no reason to believe that these statements were prejudicial. Moreover, the record certainly does not show that in reaching this same conclusion, the Court of Appeal acted unreasonably or even erroneously. As the Supreme Court's recent decision in *Davis* reminds us, and as the majority acknowledges, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." 135 S. Ct. at 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original)). Deck "must show that the state court's decision to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Id*. (quoting *Harrington*, 562 U.S. at 103). The majority's conclusion that "the [prosecutor's] rebuttal argument may have seriously misled the jury" does not support a determination that the state court's decision to reject Deck's claim was so lacking in justification that no fair-minded jurist could have adopted the state court's assessment that it did not.

## IV.    Conclusion

Relief under § 2254(d) is appropriate only where the state court's holding is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The Supreme Court has specifically warned our court that, "[b]y framing [Supreme Court] precedents at [too]

high [a] level of generality, [we] could transform even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court' . . .[, which] would defeat the substantial deference that AEDPA requires [to state courts]." *Jackson*, 133 S. Ct. at 1994. The majority flouts the Supreme Court's clear directive, and in the absence of clearly applicable Supreme Court precedent, concludes that Deck is entitled to § 2254 relief, merely because the majority believes that the Court of Appeal's decision is incorrect.[2] For these reasons, I

---

[2] With regard to our treatment of petitions under § 2254, Justice Scalia recently observed:

> It is a regrettable reality that some federal judges *like* to second-guess state courts. The only way this Court can ensure observance of Congress's abridgement of their habeas power is to perform the unaccustomed task of reviewing utterly fact-bound decisions that present no disputed issues of law. We have often not shrunk from that task, which we have found particularly needful with regard to decisions of the Ninth Circuit. *See, e.g.*, *Cavazos v. Smith*, 565 U.S. 1, 132 S. Ct. 2, — L.Ed.2d — (2011) (per curiam) (reinstating California conviction for assault on a child resulting in death); *Felkner v. Jackson*, 562 U.S. —, 131 S. Ct. 1305, 179 L.Ed.2d 374 (2011) (per curiam) (reinstating California conviction for sexual attack on a 72–year–old woman); *Premo v. Moore*, 562 U.S. —, 131 S. Ct. 733, 178 L.Ed.2d 649 (2011) (reinstating Oregon conviction for murder of a kidnapped victim); *Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 173 L.Ed.2d 251 (2009) (reinstating California first-degree murder conviction); *Rice v. Collins*, 546 U.S. 333, 126 S. Ct. 969, 163 L.Ed.2d 824 (2006) (reinstating California conviction for cocaine possession); *Kane v. Garcia Espitia*, 546 U.S. 9, 126 S. Ct. 407, 163 L.Ed.2d 10 (2005) (per curiam) (reinstating California conviction for

respectfully dissent.

---

carjacking and other offenses); *Yarborough v. Gentry*, 540 U.S. 1, 124 S. Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) (reinstating California conviction for assault with a deadly weapon); *Woodford v. Visciotti*, 537 U.S. 19, 123 S. Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (reinstating capital sentence for California prisoner convicted of first-degree murder, attempted murder, and armed robbery).

*Cash v. Maxwell*, 132 S. Ct. 611, 616–17 (2012) (Scalia, J., dissenting from the denial of certiorari).